COMMONWEALTH *vs.* MICHAEL CALDWELL.

No. 93-P-843.

Hampden. February 8, 1994. - May 31, 1994.

Present: DREBEN, JACOBS, & GILLERMAN, JJ.

Further appellate review granted, 418 Mass. 1105 (1994).

*Jury and Jurors. Practice, Criminal,* Challenge to jurors, Preservation of evidence, Loss of evidence by prosecution. *Constitutional Law,* Jury, Search and seizure, Admissions and confessions. *Search and Seizure,* Threshold police inquiry. *Identification. Evidence,* Admissions and confessions, Failure to produce witness, Judicial discretion. *Witness,* Unavailability, Hostile witness.

At a criminal trial the judge correctly concluded that the Commonwealth's use of peremptory challenges to exclude all the black prospective jurors was an improper pattern of discrimination based on race and properly required the Commonwealth to provide a race-neutral reason for each of those challenges. [572-574]

With respect to two of four black jurors challenged peremptorily by the Commonwealth at a criminal trial, the trial judge's conclusion that the challenges were justified on a race-neutral basis was incorrect, where the prosecutor's stated reasons for challenging did not meet the burden of articulating clear, neutral, and specific reasons that were personal to the challenged individuals: the defendant's constitutional right to an impartial jury was violated and a new trial was required. [574-578]

Police officers who approached a suspect on a public street and engaged him in conversation in order to ascertain the brand of cigarettes he smoked did not thereby improperly restrain or search the suspect; the judge at a subsequent trial correctly refused to suppress the testimony of the officers regarding the brand of cigarettes they observed the defendant carrying. [578-579]

A criminal defendant did not carry his burden of proving by a preponderance of the evidence that the photographic identifications of him were unnecessarily suggestive; moreover he did not establish that he was prejudiced by lost or misplaced photographs from the original array, subsequently reconstructed in part. [579-580]

At a criminal trial the judge correctly refused to suppress a spontaneous inculpatory remark of the defendant made while he was in custody and after receiving Miranda warnings, where the statement was not a product of any interrogation. [580-581]

At the retrial of a criminal case, the matter of an instruction on missing witnesses should be considered anew. [581-582]

At a criminal trial the judge properly allowed the prosecution to ask lead-
ing questions of its own witness (the defendant's girlfriend) on the basis
of the witness's demeanor and the manner of her answering questions.
[582]

INDICTMENTS found and returned in the Superior Court
Department on September 6, 1985.

Pretrial motions to suppress evidence were heard by *Wil-
liam W. Simons*, J., and the cases were tried before *Ernest
S. Hayeck*, J., sitting under statutory authority.

*Alan Jay Black* for the defendant.

*Elizabeth Dunphy Farris*, Assistant District Attorney, for
the Commonwealth.

GILLERMAN, J. Two women in their early twenties were ab-
ducted in downtown Springfield at approximately 3:00 A.M.
on August 18, 1985, as they entered the automobile of one of
the women.[1] A man surprised them from behind and, dis-
playing a knife, ordered them into the front seat. Holding the
knife between their heads, he drove through Springfield until
he came to Blunt Park, near American International College.
Once there, one of the women was raped repeatedly, and
both women were forced to perform a variety of sexual acts,
all of which lasted about one and one-half hours. After the
rapes, the assailant attempted to leave the scene with the two
women, but the automobile would not start. The assailant
and the two women then walked toward Putnam High
School; he said his grandmother lived nearby. The group
walked together for approximately one mile — about twenty
minutes — during which time, as the day grew lighter, both
women intermittently looked at their assailant.[2] Eventually
the assailant walked away from the women at a fork in the
road, and the two women went to the home of one of the

---

[1]The facts recited in this paragraph are taken from the Commonwealth's
undisputed evidence.

[2]One of the women testified that "I stared at him purposely to memorize
what he was wearing and what he looked like so that I could give a
description of him to somebody."

women's relatives. They immediately called the police and provided a detailed description of the perpetrator.[3]

Eight months later, the defendant was convicted on the thirteen indictments with which he was charged: three counts of aggravated rape; three counts of indecent assault and battery; assault with intent to commit rape; two counts of kidnapping; assault and battery with a dangerous weapon; assault with a dangerous weapon; threatening to commit a crime; and operating a motor vehicle without authority. He was sentenced to fifteen to twenty years on the aggravated rape charges, with all other sentences to run concurrently. On appeal, he argues that the judge erred in (1) allowing the Commonwealth to exercise peremptory challenges that removed four black prospective jurors; (2) denying his motion to suppress; (3) giving a missing witness instruction; and (4) allowing the Commonwealth to lead and impeach its own witness. We conclude that the jury selection was defective, depriving the defendant of his constitutional rights. There must be a new trial. See *Commonwealth* v. *Johnson*, 417 Mass. 498, 505 (1994).

1. *Jury selection.* The defendant is black, and both the complainants are white. The prosecutor exercised peremptory challenges to excuse six prospective jurors, including four

---

[3]At the trial, the Commonwealth presented evidence that both women had positively identified the defendant from a photographic array two days after the crimes and that one of them had chosen him from a lineup. The other asked the defendant to step forward twice but made no identification because, she testified at trial, she panicked and became very nervous. Both women made positive in-court identifications of the defendant. Additional evidence presented by the Commonwealth corroborated many of the significant details provided by the women regarding the defendant's physical description, clothing, and way of speaking.

The defendant maintained at the trial that he was not the assailant because, during the time of the assaults, he was asleep in the apartment of his aunt, who lived below his grandparents in a two-story house on Montrose Street. He testified that, on August 18 at approximately 2:45 A.M., after being with his girlfriend, he went to a Pizza King restaurant, and that, at about 3 A.M., he woke his cousin, Rodney Caldwell, by knocking on the door. He was let in, and he slept in a chair until about 7:30 or 8 A.M., when he left to get his grandfather a newspaper. There were significant discrepancies between the defendant's trial testimony and the statement he gave the police following his arrest.

black individuals — prospective jurors 4-1, 4-2, 4-5, and 5-1. The defendant objected on the ground that all the black prospective jurors had been challenged, but the judge allowed all four challenges, and no black person sat as a juror or as an alternate on the final panel.

The applicable standards of review are familiar. "The use of peremptory challenges to exclude prospective jurors solely because of bias presumed to derive from their membership in discrete community groups is prohibited both by art. 12 [of the Declaration of Rights of the Massachusetts Constitution], see *Commonwealth v. Soares*, 377 Mass. 461, 486-488, cert. denied, 444 U.S. 881 (1979), and the equal protection clause [of the Federal Constitution], see *Batson v. Kentucky*, 476 U.S. 79, 84-88 (1986). Under these decisions, once the party contesting a peremptory challenge rebuts the ordinary presumption that the challenge was properly used by making a showing of an improper basis for the challenge, the challenging party must provide, if possible, a neutral explanation establishing that the challenge is unrelated to the prospective juror's group affiliation. See *Commonwealth v. Soares, supra* at 491; *Batson v. Kentucky, supra* at 97-98. Evidence of a pattern of challenges of members of the same discrete group as the defendant is sufficient to rebut the presumption of proper use of challenges." *Commonwealth v. Harris*, 409 Mass. 461, 464 (1991).

If the presumption of regularity is rebutted, the judge must decide whether the reasons offered by the party whose challenge is at issue are "bona fide reason[] [rather than] sham excuse[s] belatedly contrived to avoid admitting facts of group discrimination." *Commonwealth v. Fryar*, 414 Mass. 732, 739 (1993). The reasons must be "personal to the juror and not based on the juror's group affiliation." *Commonwealth v. Young*, 401 Mass. 390, 401 (1987), and they must be "clear and reasonably specific," *Commonwealth v. Mathews*, 31 Mass. App. Ct. 564, 568 (1991). An infraction of the right to an impartial jury can never be treated as harmless error. *Commonwealth v. Hyatt*, 409 Mass. 689, 692 (1991). However, we do not substitute our judgment for that

of the trial judge if there is support for his decision in the record. *Commonwealth* v. *DiMatteo*, 12 Mass. App. Ct. 547, 552 (1981).

Here the Commonwealth's peremptory challenges excluded all black jurors, rebutting the presumption of regularity, see *Commonwealth* v. *Harris*, 409 Mass. at 464, and the judge implicitly so found. See *Commonwealth* v. *Mathews*, 31 Mass. App. Ct. at 569. We must review the record of the proceedings regarding prospective jurors 4-1, 4-2, 4-5, and 5-1 to determine whether the Commonwealth's challenges were bona fide.

a. *Prospective juror. 4-1.* The prosecutor told the judge that he objected to 4-1 because of "my perception of her reactions to the questions you posed to her" during the individual voir dire. The prosecutor explained: 4-1 "was equivocating about those answers regarding police officers. . . ." The judge said that he saw no reason to reject the challenge to 4-1, thereby accepting the reasons proffered by the prosecutor.

The record does not support the judge's conclusion. The prosecutor may have been objecting to the prospective juror's demeanor, and we assume that, in particular cases, the exercise of a peremptory challenge based on demeanor alone may be acceptably neutral. See, for example, *Commonwealth* v. *Burnett*, *ante* 1, 4, further appellate review granted, 417 Mass. 1104 (1994) (judge agreed that the juror was "hostile and argumentative"). While the "true flavor" of the voir dire is not easily discerned, *ibid.*, we nevertheless cannot agree that the statements of this juror revealed anything other than close attention to the questions asked of her.

The following exchange occurred between this prospective juror and the trial judge:

> JUDGE: "[G]enerally speaking do you think that police officers tend to be more truthful than persons in other professions?"

> JUROR 4-1: "What other professions?"

JUDGE: "Anything in the whole world, like bank examiners. That's what you do for a living?"

JUROR 4-1: "Yes."

JUDGE: "More truthful?"

JUROR 4-1: "I don't know. I really haven't had that much experience."

JUDGE: "Do you think they're any less truthful?"

JUROR 4-1: "Any less truthful? They should be more truthful but I'm not saying that they are."

JUDGE: "How do you feel about it?"

JUROR 4-1: "Well, I believe I would have to hear what they have to say before and [sic] disregard what they are and then make up my mind."

JUDGE: "Would you be able to disregard what they are?"

JUROR 4-1: "If I had to make a decision, I would like to and just hear what the content of what they have to say more so than what they are."

JUDGE: "Okay."

This colloquy leaves us with the clear impression — not of equivocation, as the prosecutor argued — but of a conscientious person who intelligently and thoughtfully focuses on the question asked and replies in a precise manner. *Commonwealth* v. *Soares* teaches that "peremptory challenges may [continue to] be used to eliminate prospective jurors whose unique relationship to the particular case raises the spectre of individual bias." *Id.* at 485. No such spectre appears with regard to this prospective juror, and the challenge should not have been permitted.

b. *Prospective juror 4-2.* During the voir dire of this prospective juror (with the last name of Solivan), the prosecutor approached the bench and told the judge that "the officer sitting with me in the jury selection . . . may have had dealings with members of her family. If she is the same Sullivan [sic] that used to live in the North End of Springfield. It is a section about a mile from where she lives now. He believes he has had dealings with members of her family." The judge then asked the prospective juror: "Mrs. Sullivan [sic], did you live in the North End of Springfield at some time or other?" The prospective juror replied, "Yes, I did." No further questions were put to this prospective juror.

On the basis of this colloquy, the Commonwealth argues to this court that the peremptory challenge was justified because the prosecutor appropriately brought to the judge's attention that this prospective juror may not have answered the individual voir dire questions truthfully. A majority of the panel disagrees.[4]

The fact that the judge established that prospective juror Solivan lived in the North End "at some time or other" did nothing to eliminate the vagueness in the prosecutor's proffered explanation for the challenge. Absent is any suggestion of what the officer may have meant by "dealings," or with which member of the Solivan family he may have dealt. It is left entirely to conjecture whether the "dealing" was brief and innocuous, or something worthy of attention, and we are left to speculate about all aspects of the involvement, and whether the prospective juror might have had reason to know of it — for the mere fact of involvement, without more, is inconsequential to the prospective juror's truthfulness. The prosecutor offered no answers to any of these obvious and important questions, and the judge made no inquiry.

The result is that the prosecutor's stated reason, the possible untruthfulness of the prospective juror, failed to meet the burden of articulating clear, neutral, and specific reasons

---

[4] Justice Dreben views the challenge to prospective juror 4-2 as perhaps passing muster but finds it unnecessary to decide its validity. A decision as to this particular challenge is not critical to the disposition of this case.

which were personal to this challenged black individual.[5] See *Commonwealth* v. *Mathews*, 31 Mass. App. Ct. at 568.

c. *Prospective juror 4-5.* The Commonwealth's claim regarding this prospective juror is that her modest educational achievement (highest school level was the fifth grade) precluded her from dealing conceptually with certain matters, and that the Commonwealth's case "involve[d] concepts of distance and identification." In further support of this position, the Commonwealth cites the fact that, on voir dire, she could not give the ages of her children.

The record reveals no neutral basis for the peremptory challenge. The primary issue at the trial was the identification of the assailant. An alibi defense was offered: the defendant claimed that he was sleeping in his aunt's apartment when the rapes occurred. See note 3, *supra.* There was nothing in that defense that was, or could have been, demonstrably self-refuting because of "concepts of distance." See *Commonwealth* v. *Carleton, ante* 137, 142-143 (1994) ("[T]he prosecutor never explained why their level of education was important in a trial where the central issue was simply whether the defendant's conduct amounted to a violation of the injunction"). We note also that, at first the judge said, "excluding her because of her highest . . . educational level . . . wouldn't be a proper thing to do." See *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545, 551 n.8 (1993) ("Mark Twain (Samuel Clemens) once stated: 'I have never let my schooling interfere with my education' ").

That the prospective juror could not immediately compute the ages of her children should not disqualify her. She recited the year in which each one of her six children were born. She said she could remember that "better than I can

---

[5]At the trial, the prosecutor stated that he "presumed" that Mrs. Solivan was not black. The defendant's counsel replied that "[s]he appears visibly to be a person of color . . . ." The judge replied, "Okay," and proceeded with the inquiry regarding the basis for the challenge of the Commonwealth. We take this to be a decision by the judge that a peremptory challenge regarding Mrs. Solivan presented a *Soares* problem.

the age." The argument that this exchange demonstrates her lack of personal qualification is frivolous.[6]

In sum, "[t]he Commonwealth . . . failed to justify the challenge[s] [to prospective jurors 4-1 and 4-5] with . . . persuasive neutral reason[s] unrelated to the defendant's group membership." *Commonwealth* v. *Harris*, 409 Mass. at 468. Whether the prosecutor succeeded in carrying his burden regarding prospective juror 4-2 (see note 4, *supra*) is not critical to the disposition of this case. Here, the prosecutor, by the use of two clearly defective peremptory challenges (prospective jurors 4-1 and 4-5) succeeded in cleansing the jury of all blacks, and that is sufficient to invalidate the process by which the jury were selected. "The defendant's conviction was obtained in violation of constitutional guarantees, and must be reversed. See *Commonwealth* v. *Soares, supra* at 492-493; *Batson* v. *Kentucky, supra* at 100." *Commonwealth* v. *Harris*, 409 Mass. at 468.

2. *Motions to suppress.* The defendant maintains that the motion judge[7] erred in denying his motions to suppress the following evidence: (1) testimony of Springfield police officers that they observed the brand of cigarettes the defendant carried; (2) the victims' photographic identifications of the defendant; and (3) a statement of the defendant made while in custody at the Springfield police department.

a. *Police observations.* The judge found that on the morning of August 19, 1985, Officers Kane and Sands saw the defendant walking on Main Street, and they approached him because he closely fit the description of the assailant. During their conversation, the defendant identified himself, and the police, by a ruse, induced the defendant to produce his package of cigarettes. They saw that he carried a package of Newport Light cigarettes, the brand the complainants had said their assailant smoked. The defendant maintains that he

---

[6]We need not discuss prospective juror 5-1. Counsel for the defendant admitted to the judge that the prosecution had offered a "plausible explanation." We agree. This juror stated that she had long-standing vacation plans, and would remain only if she had to do so.

[7]The judge who heard these three motions did not preside over the trial.

was subjected to an illegal search and seizure, and that the judge erred by denying his motion to suppress the officers' testimony regarding their observations. The argument has no merit. The judge's careful memorandum, amply supported by the record at the hearing on the motion, concludes that the police had "reasonable grounds to believe that the defendant met the description of the assailant"; that the defendant "was not restrained or placed in any form of custody"; and that the "officers' attempt to obtain identification from the defendant was within the limits of acceptable police procedure. . . ." See *Adams* v. *Williams*, 407 U.S. 143, 146 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time").

b. *Suggestiveness of photograph array.* Within the week before the motion hearing, the police discovered that the ten to twelve photographs in the original photographic array,[8] from which both complainants identified the defendant, were either lost or misplaced. Having recorded the identification numbers of seven of these photographs, the police reconstructed the array. Three of these seven photographs, including the defendant's, were reprints of those in the original array. As for the other four photographs, the police officers were certain that they pictured the faces of men included in the original array, but they were unsure whether they were the same photographs or depicted the men differently.[9]

---

[8]Before viewing this smaller array, the complainants were shown a large book of several hundred photographs of black males with some history of sexual offenses. The defendant's photograph was not among them, and neither woman made an identification.

[9]According to the police officers who testified at the hearing, a photo identification number follows an individual throughout his "career" at the police department. Therefore, regardless of how many photos the department has of the same person, all are identified with the same number, even though the individual's appearance may be different in each photograph. This method obviously creates confusion when trying to identify which particular photograph of a person was part of an array.

The defendant argues that, because the police lost or misplaced all but three of the ten to twelve photographs that were in the original array, he was deprived of an effective argument that the original identification was suggestive.

The defendant bears the burden of proving by a preponderance of the evidence that the photographic identifications were unnecessarily suggestive. *Commonwealth* v. *Venios*, 378 Mass. 24, 29 (1979). The motion judge, whose detailed findings regarding the original identification procedure are supported in the record, concluded that the identifications were not the result of any impermissible or suggestive police procedure. Moreover, the defendant has not established that the lost or misplaced photographs were potentially exculpatory. See *Commonwealth* v. *Willie*, 400 Mass. 427, 433 (1987); *Commonwealth* v. *Olszewski*, 401 Mass. 749, 754 (1988); *Commonwealth* v. *Henderson*, 411 Mass. 309, 311 (1991). The mere fact that four of the seven photographs in the reconstructed array did not resemble the defendant does not constitute "a reasonable possibility, based on concrete evidence rather than a fertile imagination," that the lost evidence would be helpful to the defendant. *Commonwealth* v. *Olszewski*, 401 Mass. at 754.

c. *Admissibility of incriminating statement.* We summarize the facts found by the motion judge. On August 20, 1985, the police executed a warrant for the defendant's arrest at his home. An officer told the defendant, who was then seventeen, that he was being charged with kidnapping and rape, and read him his Miranda rights. The warnings were read while the defendant was going to his bedroom to put on a shirt and shoes, and while his mother was protesting in a loud voice.

The judge found that notwithstanding the "tumult" from his mother's actions, the defendant was fairly advised of his rights and understood them. Upon his arrival at the police station, the defendant was escorted into an interviewing room where he was told by one of the two officers present that they were investigating a rape. The defendant then said "What — two white girls?"

The judge found that "[t]he statement concerning 'two white girls' was blurted out by the defendant as a result of a comment made to advise the defendant of the subject of his arrest." The defendant's spontaneous remark was made, the judge found, approximately seven to ten minutes after he had been given his Miranda warnings in his house.

Based on the subsidiary findings, which are not clearly erroneous, we conclude that there was no interrogation, that is, no "express questioning or its functional equivalent," within the meaning of *Rhode Island* v. *Innis,* 446 U.S. 291, 300-301 (1980), and *Commonwealth* v. *Rubio,* 27 Mass. App. Ct. 506, 511-512 (1989). See *Commonwealth* v. *Doyle,* 12 Mass. App. Ct. 786, 794 (1981) (extemporaneous remark not in response to police questioning is admissible). Consequently, there was no error in refusing to suppress the statement.

Although the issues already addressed are dispositive of this appeal, we also consider the other issues raised by the defendant as they may affect further proceedings on these charges.

3. *Missing witness.* The judge gave a missing witness instruction regarding the defendant's failure to call as a witness his cousin Rodney Caldwell (see note 3, *supra*), and allowed the prosecutor to suggest in his final argument that the jury draw an unfavorable inference from this failure. Without asking the judge's permission, however, the prosecutor also discussed the defendant's failure to call his grandfather and employees of the Pizza King restaurant as witnesses (see note 3, *supra*). The defendant objected to the prosecutor's closing argument and the giving of the instruction.

The judge did not abuse his discretion in giving the missing witness instruction or in allowing the prosecutor's comments regarding Rodney Caldwell. There was a sufficient foundation for the argument and the instruction. See *Commonwealth* v. *Schatvet,* 23 Mass. App. Ct. 130, 134 (1986). Contrary to the defendant's suggestion that Rodney Caldwell's testimony would have been cumulative because Rodney Caldwell did not know the hour at which the defendant arrived, see *Commonwealth* v. *Buonopane,* 9 Mass. App. Ct.

651, 659 (1980), the mere fact that Rodney Caldwell could have supported the defendant's claim that he woke his cousin in the middle of the night and slept at the apartment would have been corroborative of his alibi defense. See *Commonwealth* v. *Bryer*, 398 Mass. 9, 13 (1986) ("The fact that [the missing witness] could not have *fully* corroborated the defendant's story if it were true does not bar prosecutorial comment or inquiry on these lines" [emphasis original]).

As for the prosecutor's reference — without having obtained a prior favorable ruling from the judge — to the defendant's failure to call his grandfather and the employees of the Pizza King restaurant to corroborate his story, see *Commonwealth* v. *Graves*, 35 Mass. App. Ct. 76, 81 (1993), that failure does not itself ordinarily create a basis for reversal; it merely creates the risk that the attorney will be interrupted by the judge who may then give an unfavorable instruction to the jury, as in *Commonwealth* v. *Vasquez*, 27 Mass. 655, 657-658 (1989). Here the judge did not interrupt counsel, and we must therefore assume that he found the comments justified by the evidence. It is not clear, however, that there was evidence of the availability of the two witnesses, and at the retrial, the matter should be considered anew.

4. *Hostile witness.* There is no merit to the defendant's claim that the judge abused his discretion by allowing the prosecutor to ask leading questions of the Commonwealth's own witness, the defendant's girlfriend Pamela Bartos, and to attempt to impeach her by showing bias. The judge allowed the questioning because of the witness's demeanor and the manner in which she answered questions; there was no abuse of discretion. See, e.g., *Commonwealth* v. *Flynn*, 362 Mass. 455, 467 (1972); *Commonwealth* v. *Peloquin*, 30 Mass. App. Ct. 960, 961 (1991).

*Judgments reversed.*
*Verdicts set aside.*