Michael **CALDWELL**, Petitioner,

v.

Larry E. **DUBOIS**, Respondent.

**No. Civ.A. 95–30157–MAP.**

United States District Court, D. Massachusetts.

March 31, 1998.

Alan J. Black, Alan Black, Springfield, MA, for petitioner.

Anne Schultze Edwards, Atty. Gen. Office, Boston, MA, Nina L. Ross, Asst. Atty. Gen., Boston, MA, for respondent.

## MEMORANDUM REGARDING REPORT AND RECOMMENDATION ON PLAINTIFF'S PETITION FOR WRIT OF HABEAS CORPUS

PONSOR, District Judge.

### I. INTRODUCTION

In 1986, Michael Caldwell ("Petitioner"), an African–American, was convicted by an all-white Superior Court jury in Springfield, Massachusetts of a number of crimes against two white females, including aggravated rape and indecent assault and battery, and was sentenced to 15–20 years in prison. Eight years later, Petitioner's convictions were set aside by a three-judge panel of the Massachusetts Appeals Court because the Commonwealth ("Respondent") impermissibly used its peremptory challenges to exclude the only four black potential members of the jury, in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and *Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499, *cert. denied, Massachusetts v. Soares,* 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979). *Commonwealth v. Caldwell (Caldwell I),* 36 Mass.App.Ct. 570, 578, 634 N.E.2d 124 (1994).

Subsequently, the Supreme Judicial Court ("SJC") reversed the Appeals Court and reinstated the verdicts, concluding that the trial court's finding of no misuse of the peremptories was adequately supported by the record, particularly in view of the deference due to the trial judge on this issue. *Commonwealth v. Caldwell (Caldwell II),* 418 Mass. 777, 641·N.E.2d 1054 (1994).

Pursuant to 28 U.S.C. § 2254 (1994), Petitioner has now come to this court seeking habeas corpus relief, contending once more that he was denied the right to a fair trial in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Because the Commonwealth's decision to exclude at least two of the four black jurors rested on no remotely plausible legitimate justification, and can only be explained by the jurors' race, and because the trial judge failed, or was unable, to make adequate findings to support his acceptance of the Commonwealth's reasoning, the Petition must be granted.

▇▇▇ As the substantial amount of time taken by the court to render this opinion makes clear, this decision has not been made lightly. Both common sense and controlling authority teach that trial judges must be afforded great deference in the selection of juries. *Hernandez v. New York,* 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *Brewer v. Marshall,* 119 F.3d 993, 1004 (1st Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 1172, 140 L.Ed.2d 182 (1998). As a trial judge myself, I am acutely aware that crucial nuances in the selection process may not appear on a cold record later. But racial discrimination is itself subtle and can mold a prosecutor's decisions unconsciously.[1] Courts nevertheless have an obligation, after the fact, to assess whether a trial has been infected by this form of invidious bias.

Here, to summarize, the prosecutor excluded one African American juror on the ground that she was "equivocating" in her responses regarding the credibility of police officers, when the record reveals *no* equivocation, and where comparable or even more problematic responses by a white juror to the same questions drew no objection. A second African American juror suffered a challenge based on her supposed inability, due to her limited

---

1. The Assistant District Attorney who tried this case for the Commonwealth in 1986, now a respected private practitioner, has appeared before this court on numerous occasions and would never be guilty of any conscious racial discrimination. Nothing in this decision is intended to suggest otherwise.

formal education, to understand this "complex" case—when the record reveals no special complexity in the trial and no particular disability in the juror.

As Justice Marshall said in his concurring opinion in *Batson:*

> [W]hen a defendant can establish a prima facie case, trial courts face the difficult burden of assessing prosecutors' motives. Any prosecutor can easily assert facially neutral reasons for striking a juror, and trial courts are ill equipped to second-guess those reasons. How is the court to treat a prosecutor's statement that he struck a juror because the juror had a son about the same age as defendant, or seemed "uncommunicative," or "never cracked a smile" and, therefore "did not possess the sensitivities necessary to realistically look at the issues and decide the facts in this case"? If such easily generated explanations are sufficient to discharge the prosecutor's obligation to justify his strikes on nonracial grounds, then the protection erected by the Court today may be illusory.

*Batson,* 476 U.S. at 105–06 (Marshall, J., concurring) (citations omitted).

In some cases, the court, despite all the difficulties, must drop the pretense of admiring the Emperor's clothes and concede the naked truth: racial bias obviously tainted the process of jury selection. This is one of those rare cases.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of April 18, 1985, two white women were forced into a car at knifepoint by a black male who then repeatedly raped one woman, assaulted the other, and forced both to perform a variety of sexual acts over a period of an hour and a half. Eventually, the women escaped and notified police. Two days later, both women identified Petitioner from police photos as their attacker.

Petitioner was charged in a thirteen-count indictment with three counts of aggravated rape, three counts of indecent assault and battery, one count of assault with intent to commit rape, two counts of kidnaping, one count of assault and battery with a dangerous weapon, one count of threat to commit a crime and one count of operation of a motor vehicle without authority. Caldwell maintained that he was not the attacker and that, at the time of the incident, he was asleep at his aunt's apartment.

On March 27, 1986, in Hampden County Superior Court in Springfield, Petitioner's trial commenced. The trial judge, a state district court judge sitting by designation in superior court, conducted a *voir dire,* individually questioning potential jurors.[2] Following

2. The *voir dire* consisted of ten questions, as follows:

1) These indictments charge the Defendant with aggravated rape and kidnaping among other things. Is there anything about this type of offense which would make it impossible for you to be completely fair and impartial in judging this case?

2) During the course of this case there may be explicit testimony regarding specific sexual acts that allegedly took place. Would this cause you any embarrassment, discomfort or would it in any way make it difficult for you to be completely fair and impartial in judging this case?

3) Have you or has anyone in your immediate family ever been the victim of a rape, sexual assault or any other crime of violence?

4) Have you or has anyone in your immediate family ever been affiliated with or employed by a law enforcement agency?

5) Do you or does anyone in your immediate family belong to any organization whose primary purpose is to educate or inform the public about the problems of rape or sexual abuse?

6) Much of the testimony in this case will come from police officers. If a police officer and another witness gave you different testimony about the same incident, would you tend to believe the police officer simply because he is a police officer?

7) The alleged victims in this case are white and the defendant is black. Is there anything about this fact that would cause you to be anything less than completely fair and impartial in judging this case?

8) Do you think that black people generally speaking are less truthful than white people?

9) Do you think that black people are more truthful?

10) Do you think that generally speaking black people tend to be more violent than white people?

the questioning, twelve jurors were seated, of whom four were African American. The prosecutor had not objected during the *voir dire* to three of the four black jurors and only raised concerns regarding the fourth (juror number 5–1) based on her conflicting vacation plans. These concerns were brushed aside by the court, when the juror indicated she would be willing to sit if called upon to do so.

Once the twelve prospective jurors were seated, however, the assistant district attorney exercised five peremptory challenges, four of them against all four of the potential black jury members, numbered 4–1, 4–2, 4–5, and 5–1. Defense counsel immediately objected. Although the trial judge did not explicitly find that Petitioner had made a *prima facie* showing of impropriety, he conducted a hearing at which he called upon the Commonwealth to justify its exercise of the peremptories. The prosecutor's reasoning is summarized as follows.

The Commonwealth challenged juror 4–1 because of her answers during the *voir dire* concerning police officers. The relevant portion of the *voir dire* of juror 4–1 reads as follows:

THE COURT: ... [M]uch of the testimony in this case will come from police officers. If a police officer and another witness gave you different testimony about the same incident, would you tend to believe the police officer simply because he is a police officer?

THE JUROR: No I wouldn't.

THE COURT: How about the other way around?

THE JUROR: If he wasn't?

THE COURT: Yes.

THE JUROR: No, I think I would have to consider all the circumstances.

THE COURT: Would you tend to put less weight on a police officer's testimony than you would on somebody else's testimony simply because the person is a police officer?

THE JUROR: Less weight on him?

THE COURT: Yes.

THE JUROR: I would try to keep equal weight.

THE COURT: ... [G]enerally speaking do you think that police officers tend to be more truthful than persons in other professions?

THE JUROR: What other professions?

THE COURT: Anything in the whole world, like bank examiners. That's what you do for a living?

THE JUROR: Yes.

THE COURT: More truthful?

THE JUROR: I don't know. I really haven't had that much experience.

THE COURT: Do you think they're any less truthful?

THE JUROR: Any less truthful? They should be more truthful but I'm not saying that they are.

THE COURT: How do you feel about it?

THE JUROR: Well, I believe I would have to hear what they have to say before and disregard what they are and then make up my mind.

THE COURT: Would you be able to disregard what they are?

THE JUROR: If I had to make a decision, I would like to and just hear what the content of what they have to say more so than what they are.

THE COURT: Okay.

The voir dire then continued:

THE COURT: ... [D]o you think that black people generally speaking are less truthful than white people?

THE JUROR: No.

THE COURT: Do you think they're more truthful?

THE JUROR: I think they're about the same.

THE COURT: Do you really mean that?

THE JUROR: People are people, regardless of color.

On the basis of this colloquy, the prosecutor asserted that he,

... found her equivocating on those answers, suggesting that she would like to be fair and impartial when it came to police officers, she would try to do this and that.

At one time, she said that they should be more truthful and it was just the way she was equivocating about those answers regarding police officers, recognizing that we have at least two or three police officers expecting to testify.

She in our view would be a risk for us and I would point out, too, at the time that I decided to challenge [juror 4–1], there had been no other blacks selected for this panel this morning. In other words, she was the first person that came in, I believe, and the decision was made at that time on the basis of her answers only. I haven't even seen who the other jurors were or the potential panel.

So, with all due respect with her, I would suggest that I could have challenged her at that time for any reason I chose. There's certainly no pattern with her when she's the first one. . . .

Relying on these remarks, the judge accepted the Commonwealth's explanation over defense counsel's objection and found that the challenge was legitimate.[3]

This colloquy presents a striking comparison with the questioning of juror 5–13, a non-minority panel member who was not challenged by the Commonwealth. The questioning unfolded as follows.

THE COURT: . . . If a police officer and another witness gave you different testimony about the same incident, would you tend to believe the police officer simply because he is a police officer?

THE JUROR: No.

THE COURT: How about the other way around; would you tend to disbelieve him just because he is a police officer?

THE JUROR: No.

THE COURT: Number 7, generally speaking do you think that police officers tend to be more truthful than persons in other professions?

THE JUROR: I don't know. That's a—I don't know. Do you mean professionally

or do you mean in every day life? I mean, I'm sure a police officer lies every now and then to his wife or to his neighbor, but—

THE COURT: Don't forget girlfriends.

THE JUROR: Girlfriends. Because, as far as being in his profession, I would say no.

THE COURT: Let me ask a question then, generally speaking do you think that police officers tend to be more truthful than persons in other professions, than other people?

THE JUROR: In other professions, yes.

THE COURT: You think they tend to be more truthful?

THE JUROR: In their profession. Do I have to say yes or no?

THE COURT: Yes, it would help me a lot if you could.

THE JUROR: That's all I have to say is yes or no, but I don't really understand the question.

THE COURT: Let me put it the other way around. Do you think they tend to be less truthful than other people?

THE JUROR: No.

THE COURT: Do you think they tend to be more truthful than other people?

THE JUROR: I think they would be the same as any other person.

As noted, the prosecutor expressed no concerns regarding "equivocation" about this white juror.

With regard to juror 4–2, based on the pronunciation of the juror's name, Solivan, one of the witness-officers informed the prosecutor that he "may have had dealings with members of her family. If she is the same Sullivan that used to live in the North End of Springfield." At the prosecutor's behest, the trial judge asked juror 4–2 whether she had lived in the North End of Springfield, to which she responded, "Yes." This was the extent of the investigation of this issue. The prosecutor later stated that he was challenging juror 4–2 based on the juror's potential

3. Although the assistant district attorney stated that he *decided* to exercise his peremptory challenge against juror 4–1 at a time when he did not know the make-up of the jury as a whole, the transcript makes it clear that he actually *exer-* *cised* his challenges at one time, striking all four black jurors after he had seen the composition of the entire potential jury. Transcript of Jury Selection Proceeding at 114–18.

contact with the testifying officer, the fact that the juror had once lived in the North End of Springfield where the alleged incident occurred, and the possibility that the juror may have had some contact with the defendant's family. The court accepted these reasons without making findings on the record, and without inquiry as to when the juror lived in the North End, or where exactly she lived, or whether she had had any contact with the officer, the witnesses, or the defendant.

The Commonwealth challenged juror 4–5, because her highest level of education was fifth grade and because she had difficulty computing the ages of her seven children (aged eighteen to thirty-seven), though she could remember their years of birth. The colloquy unfolded as follows.

THE COURT: Is there anything further that you want me to inquire of this particular prospective juror, Mr. Fennell?

MR. FENNELL: Yes, Judge, simply just the ages of her children. I may not have understood that before.

THE JUROR: Eighteen through thirty-seven.

THE COURT: Can you tell us the age, how many kids have you got?

THE JUROR: I've got seven. The youngest is eighteen and the oldest one is thirty-seven or will be thirty-seven years old.

THE COURT: Can you remember all of them, how old they are? Can you remember them one by one?

THE JUROR: Okay. Starting with the oldest one, she's thirty-six and she would be thirty-seven this year. The next one, she was born in '51, so that means she's—I can't give it offhand like that. Then I've got a son that's thirty. He was born in '55.

THE COURT: You can remember the years they were born, right?

THE JUROR: I can remember that better than I can the age.

THE COURT: Give us the years then.

THE JUROR: The oldest one was born in 1948, and the next one was born in 1951 and the next one was born in 1955. The next one was born in 1957 and the next one was born in 1961. The baby was born in 1967. It's easier for me like that.

In justifying his peremptory, the prosecutor contended that the case involved "time measurements and distance units," and he believed juror 4–5's answers during the voir dire revealed that she would have difficulty following the evidence.[4] The trial court initially rejected the peremptory based on the witness' limited educational background, but was persuaded to permit the challenge over defense counsel's objection by the prosecutor's repeated references to the "complexity of the case."[5]

4. The substance of the Commonwealth's objection to juror 4–5 is as follows:

MR. FENNELL (for the Commonwealth): ... I would specifically say with regards to [juror] 4–5, that I noted on her card that her highest educational level was the fifth grade.

I also noted she said the ages of her children were eighteen through thirty-seven. She was questioned about that and apparently unable to tell us the ages of the six or seven children that she has. She could only describe it by the year in which they were born and I questioned her ability to understand perhaps some of the things we are going to be dealing with because of that educational level. I will tell you certainly that time measurements and distance units are an issue in this case.

That challenge on my part for her related more to her ability to understand, in my view, the issues that we are going to be raising because of what appeared to be a very limited educational background. That's why I challenged her.

5. After the court held that education was an improper basis to challenge a juror, the following colloquy occurred:

MR. FENNELL: I would think that educational level would certainly be a factor that someone could take into account.

I point out, for example, Mr. Hoose [Petitioner's counsel] has excluded every single woman who has an educational level of high school age or beyond, every single one has been excluded of his challenges, if you look at it.

Likewise from my view, more of a problem presents itself when you feel that someone may not be able to deal with some of the issues because of an intellectual background and I frankly suspect from judging her demeanor, the way she handled those questions and the way she responded to the further questions of your Honor, she was unable for example, to add to take a birthday of one of her children and arrive at today's years and tell us how old that child was.

As noted, during the initial questioning, juror 5–1 stated that she had vacation plans that would interfere with her ability to serve through the week. However, upon further questioning by the judge, juror 5–1 stated that she would remain if requested. The prosecutor pointed to the juror's vacation plans as the justification for his challenge, and after an initial objection, defense counsel conceded the arguable legitimacy of this concern. The judge accepted this explanation and excused juror 5–1.

On April 11, 1986 Petitioner was convicted on all thirteen counts and eventually sentenced to 15–20 years on the lead indictment, with the other sentences to run concurrently. Petitioner appealed his conviction, contending that the exercise of peremptory challenges against all the black jurors violated *Batson,* and arguing that the court committed several other errors as well.[6]

On May 31, 1994 the Massachusetts Appeals Court held that Petitioner was denied his right to a fair trial because the Commonwealth's "clearly defective peremptory challenges [of] prospective jurors 4–1 and 4–5 succeeded in cleansing the jury of all blacks, and that is sufficient to invalidate the process

by which the jury were selected." *Caldwell I,* 36 Mass.App.Ct. at 578, 634 N.E.2d 124.

In reaching the conclusion that Petitioner's right to a fair trial was violated, the Appeals Court stated that juror 4–1's answers during the voir dire left them:

> with the clear impression—not of equivocation, as the prosecutor argued—but of a conscientious person who intelligently and thoughtfully focuses on the question asked and replies in a precise manner. *Commonwealth v. Soares* [,377 Mass. 461, 387 N.E.2d 499, *cert. denied,* 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979)] teaches that "peremptory challenges may [continue to] be used to eliminate prospective jurors whose unique relationship to the particular case raises the specter of individual bias." *Id.* at 485, 387 N.E.2d 499. No such specter appears with regard to this prospective juror, and the challenge should not have been permitted.

*Caldwell I,* 36 Mass.App.Ct. at 575, 634 N.E.2d 124.

Similarly, regarding juror 4–5, the Appeals Court concluded that the Commonwealth

---

We had to resort, for example to getting a year of birth as best she could recall from that child and figure it out for ourselves.

I think it shows a fundamental inability because of an educational background to deal conceptually with certain matters and I would point out, your Honor, that one of the things we intend to do in this case from the view on down is to suggest to these people the times and distances and the issue of identification, all of which require some ability to grasp the concepts which is fundamental to us.

I would think education certainly is appropriate, in fact, I'm more concerned that Mr. Hoose seems to be eliminating people because they are white women and educated than I am about someone who is uneducated who I feel might not be able to conceptually grasp some of the issues that we are going to need to persuade the jury with.

When asked to further support the reason for its challenge, the Commonwealth stated:

MR. FENNELL: ... [Mr. Hoose] may consider this case simple and fundamental. I don't. I know, for example, that part of the evidence we are going to introduce is we are going to suggest and persuade these people that times are relevant and important because someone couldn't be

here when they said they were. They were somewhere else.

There's going to be a lot of issues that require thought and perhaps he may not think it's complex, but I have considered it complex when I assess these jurors and to say that she handled the questions the same as everybody else I don't think is a fair assessment.

The woman was unable to tell us how old her children were by simply deducting the year they were born from today. I think it shows me or it has raised a concern with me irrespective of her race. I don't care who she was.

You will note that he doesn't suggest that I excluded anybody else because a fifth-grade level of education. It was not only the first person, it was the first one who demonstrated some difficulty in dealing with fundamental issues.

So, I felt in fairness to the complexity of the case that I anticipated presenting that it wasn't a juror that I desired to have and that was solely my reason.

**6.** Petitioner raised issues concerning his motion to suppress, the trial court's missing witness instruction, and the Commonwealth's leading questions to its own witness. *Caldwell I,* 36 Mass.

failed to establish a neutral basis for its challenge. *Id.* at 577, 634 N.E.2d 124.

That the prospective juror could not immediately compute the ages of her children should not disqualify her. She recited the year in which each one of her seven children were born. She said she could remember that "better than I can the age." The argument that this exchange demonstrates her lack of personal qualification is frivolous.

*Id.* at 577–78, 634 N.E.2d 124.

The Commonwealth appealed the *Batson* issue to the Massachusetts Supreme Judicial Court.[7] The SJC decision held that a threshold showing of a "pattern of discrimination" had been made out by the defendant, based both on the trial judge's request that "the prosecutor supply race-neutral explanations for his challenges" and on "the fact that, as the judge recognized, all of the black members of the venire had been challenged by the prosecutor." *Caldwell II,* 418 Mass. at 778, 641 N.E.2d 1054.

In turning to the question of whether the trial judge was correct in accepting the prosecutor's rationale for the challenges, Justice Lynch emphasized several factors. First, the prosecutor's explanation went "beyond a mere vague assertion." *Id.,* at 779, 641 N.E.2d 1054. Second, the specificity of the objection to the juror confirmed that "his challenge was personal to this particular juror and was wholly unrelated to her race." *Id.* Finally, the trial judge was in a superior position both to evaluate a juror's "personal reactions to specific questions," *id.,* and to assess "whether the prosecutor is justified in basing his objection on the juror's demeanor." *Id.* at 781, 641 N.E.2d 1054.[8]

Based on these factors, the SJC concluded "that the judge's decision that the prosecutor presented legitimate reasons for the exclusion of the jurors and that they were supported by the record is proper in light of the

deference to be afforded to the judge in these circumstances." *Id.* at 782, 641 N.E.2d 1054.

Having exhausted his state court remedies, Petitioner came to this court seeking relief pursuant to 28 U.S.C. § 2254. The Petition was duly referred to Magistrate Judge Kenneth P. Neiman for a report and recommendation in accordance with the rules of this court. The magistrate judge recommended that the Petition be allowed, because the explanation offered by the Commonwealth for excluding juror 4–5 was not fairly supported by the record. Petitioner and Respondent have filed timely objections, the former arguing that the record fails to support the challenges to at least three of the potential jurors, the latter contending that the trial judge acted properly in accepting the rationales for all four jurors. As noted, the Petitioner has also attempted to resurrect the non-*Batson* claims of error rejected by the Appeals Court and disregarded by the SJC.

## III. DISCUSSION

### A. Standard of Review

Prior to April 24, 1996, 28 U.S.C. § 2254(d) provided that a factual determination of the state court is "presumed to be correct ... *unless ... such factual determination is not fairly supported by the record.*" 28 U.S.C. § 2254(d)(8) (emphasis supplied). In the parties' initial submissions it was unclear whether this old standard was to be applied to this case or whether the stricter yardstick of the recently enacted Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, § 104, 110 Stat. 1218 ("AEDPA") would control. Respondent argued vigorously that the more restrictive standard set forth in the AEDPA should apply here; Petitioner took the contrary view.

---

App.Ct. at 578–82, 634 N.E.2d 124. The Appeals Court ruled against Petitioner on all these issues.

**7.** Petitioner did not file his own appeal of the Appeals Court's adverse rulings on his non-*Batson* issues, and the SJC therefore disregarded them. *Caldwell II,* 418 Mass. at 778 n. 2, 641 N.E.2d 1054. He has nevertheless attempted to

resurrect these non-*Batson* claims in this habeas petition. The success of this effort will be addressed below.

**8.** Justice Lynch did note wryly, however, that, as far as the juror's inability to compute the ages of her children, "she might not be unique in this regard." 418 Mass. at 780, 641 N.E.2d 1054.

The Supreme Court's decision in *Lindh v. Murphy*, —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) has resolved this issue in Petitioner's favor. *Lindh* makes clear that, because the AEDPA "change[d] standards of proof and persuasion in a way favorable to the state," this statute should not be applied retroactively. *Id.* 117 S.Ct. at 2063. This court must therefore apply the previously applicable standard and determine whether the state court's factual determination was "fairly supported by the record." In making this assessment, however, the court must bear in mind the presumption of validity underpinning state court decisions, the deference to be afforded the trial judge in jury selection particularly, and the directive that a trial judge's *Batson* determination must be upheld unless clearly erroneous. *Brewer*, 119 F.3d at 1004.

### B. Exhaustion

Federal law stipulates that no writ of habeas corpus shall be granted "unless it appears that the applicant has exhausted the remedies available in the courts of the State" 28 U.S.C. § 2254(b). Here, there is no dispute that Petitioner has fully exhausted all state court remedies regarding his claim of a *Batson* violation in the jury selection.

However, as noted above, Petitioner in his original submissions to the Massachusetts Appeals Court also attempted to raise claims of error unrelated to jury selection. All these claims were rejected by the Appeals Court in the same decision that found the Batson violation. *Caldwell I,* 36 Mass.App. Ct. at 578–82, 634 N.E.2d 124. When the Commonwealth appealed the adverse *Batson* finding to the SJC, the defendant never sought further appellate review of the non-*Batson* claims rejected by the Appeals Court. As a result, the SJC declined to hear them. In a Motion for Reconsideration submitted to the SJC, Petitioner argued that prior decisional law justified him in assuming that the SJC would review *all* issues raised before the Appeals Court, regardless of whether they were formally presented by the defendant in response to the Commonwealth's appeal to the SJC. The Motion for Reconsideration was denied.

The Petition filed with this court and the addendum to it raise only the *Batson* claim. Nevertheless, Petitioner's attorney has attempted in his supporting memorandum to argue, in addition, that the Supreme Judicial Court of Massachusetts denied Petitioner his "right to fair procedures" in refusing to review the non-*Batson* claims rejected by the Appeals Court. It is obvious from the record that this argument has never been presented to the courts of the Commonwealth of Massachusetts. The Motion for Reconsideration objected only to what the Petitioner argued was a procedural lapse by the SJC and asserted no constitutional due process violation.

The absence of any non-*Batson* claim from the petition, and its inclusion only as a matter of argument in Petitioner's memorandum, would in itself probably be sufficient to eliminate the claim from this court's consideration. If the non-*Batson* claim stood properly before the court, its presence would render the petition "mixed"—i.e., offering both exhausted and unexhausted claims. *Rose v. Lundy,* 455 U.S. 509, 520–21, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Petitioner's counsel indicated at oral argument that, if the court found that the petition was mixed, he would agree to dismissal of the unexhausted claims, to permit the petition, focusing solely on the *Batson* issue, to go forward. *Watkins v. Ponte,* 987 F.2d 27, 30 (1st Cir.1993). To insure no confusion, the court will dismiss all non-*Batson* issues from this case and address the sole issue presented by the petition, the Batson violation.

### C. The Batson Issue

A fairly and impartially selected jury is not only the heart of our criminal justice system, but a crucial component of our nation's structure of democratic government. In 1922 Chief Justice Taft wrote:

> The jury system postulates the conscious duty of participation in the machinery of justice.... One of the greatest benefits is the security it gives the people that they, as jurors actual or possible, being part of the judicial system of the country, can prevent its arbitrary use or abuse.

*Balzac v. Porto Rico,* 258 U.S. 298, 310, 42 S.Ct. 343, 66 L.Ed. 627 (1922), *quoted in*

*Alexis v. Leporati,* 1996 WL 463675, *2 (D.Mass. July 30, 1996).

■ The Supreme Court has recognized that the goal of impartially selected juries can be achieved only when all citizens have the same opportunity to participate in the process. Thus, the court has held that the exercise of peremptory challenges in a manner that excludes individuals from jury service on account of their race is a violation of the Equal Protection Clause of the Fourteenth Amendment. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

It is worth noting that *Batson* explicitly overruled a portion of *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). In that case, the prosecutor had used his peremptory challenges to remove all six black members of a jury panel in the criminal trial of a black defendant. The court observed that, at that time, the peremptory challenge was "frequently exercised on grounds normally thought irrelevant to legal proceedings or official actions, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty." *Swain,* 380 U.S. at 220. In 1965, the court was prepared to accept this practice, refusing to hold that "the striking of Negroes in a particular case is a denial of equal protection of the laws." *Id.* at 221. *Swain* permitted a constitutional challenge only where extended experience demonstrated "a state's *systematic* striking of Negroes in the selection of petit juries." *Id.* at 224 (emphasis added).

■ Batson reached the opposite conclusion and overruled this aspect of *Swain.* The *Batson* decision stands for the proposition that "where a prosecutor bases peremptory challenges on race, even in just one case, those challenges constitute state action and violate the Fourteenth Amendment rights of both the prospective jurors and the criminal defendant." *United States v. Annigoni,* 96 F.3d 1132, 1140 (9th Cir.1996).

Cases since *Batson* have served to emphasize even more vividly the central values informing the Court's holding. *Holland v. Illinois,* 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990) (white defendant has standing to challenge racially motivated peremptory strikes against minority jurors);

*Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (extending *Batson* to private litigants in civil actions); *Georgia v. McCollum,* 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (*Batson* applicable to defendant's peremptory challenges, as well as government's); *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (extending *Batson* principle to peremptory strikes based on gender).

■ *Batson* itself set forth the now familiar three-part test used to evaluate equal protection challenges to a prosecutor's use of peremptory strikes. *Batson,* 476 U.S. at 96–98. First, the defendant must "make a *prima facie* showing of discrimination in the prosecutor's launching of the strike." *U.S. v. Bergodere,* 40 F.3d 512, 515 (1st Cir.1994), *cert. denied,* 514 U.S. 1055, 115 S.Ct. 1439, 131 L.Ed.2d 318 (1995). Second, the prosecutor must "articulate a race-neutral explanation for the strike." *U.S. v. Perez,* 35 F.3d 632, 635 (1st Cir.1994). This burden is merely one of production, not persuasion. *Bergodere,* 40 F.3d at 515. Further, this second step in the process "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Finally, if the prosecutor offers a race-neutral explanation, the judge must decide whether the defendant has "carried his burden of proving that the strike constituted purposeful discrimination of the basis of race." *Perez,* 35 F.3d at 635 (citing *Hernandez v. New York,* 500 U.S. 352, 358–59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). At this stage the reviewing court must weigh the prosecutor's rationale, because "the persuasiveness of the justification becomes relevant," and the court is free to conclude that "implausible or fantastic justifications" are pretexts for purposeful discrimination. *Purkett,* 514 U.S. at 768.

■ It must be repeated that, in applying this three-part test, reviewing courts must adopt a deferential approach to the trial judge's actions. As the First Circuit has repeatedly recognized, the trial judge is "likely to have a much better sense than any appellate panel of whether a particular challenge can readily be explained by some

reason other than race or gender — for example, other characteristics of a juror, the juror's demeanor, or something in the juror's background suggesting sympathy for one side or the other." *Brewer v. Marshall*, 119 F.3d at 1004. *See also, Bergodere*, 40 F.3d at 516; *Perez*, 35 F.3d at 636. Thus, the question before this court may be distilled down to this: must this court conclude—keeping in mind the trial judge's superior position to make the call—that the decision to accept the prosecutor's explanation for his exercise of the peremptory challenges was so lacking in fair support on the record that it amounted to clear error?

Despite the deference to be shown trial judges and the heavy burden to be borne by applicants and petitioners such as Caldwell here, district courts and courts of appeals have not hesitated to vacate convictions, even in very serious cases, where a *Batson* violation has clearly occurred. The following cases provide examples where this has happened.

In a pre-*Batson* case, relying on the Supreme Court's holding in *Swain*, the Eighth Circuit reversed the judgment of the district court denying a petition for habeas corpus. In *Garrett v. Morris*, 815 F.2d 509 (8th Cir.), *cert. denied sub nom., Jones v. Garrett*, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 191 (1987), the prosecutor exercised his peremptory challenges to exclude the only three black venire persons from the petit jury panel. The prosecutor stated that the reason for his action "was the background, education and knowledge to understand fairly sophisticated scientific evidence which I intend to bring to the jury in this case." *Garrett*, 815 F.2d at 510. The Court of Appeals acknowledged that, as a general matter, a prosecutor might rely upon such considerations in exercising his peremptory challenges. The court noted, however, that many unchallenged white jurors had very limited education and that all three challenged black jurors had at least a high school education and one needed only three additional hours of credit to complete a college business degree. *Id.* at 513–14. Based upon this, Judge Arnold concluded that "the reasons volunteered by the pros-

ecutor are simply not fairly supported by the record." *Id.* at 514. The court stated:

> Nor can we discern from the record any other legitimate trial-related reasons for striking all three black jurors. Despite the prosecutor's disclaimer of racial motives, it appears that he was in effect excluding the blacks from the petit jury in this case in the belief that, as blacks, they were not qualified to serve as jurors in the trial of this black defendant.

*Id.*

Accordingly, the Court of Appeals reversed the District Court judgment denying the writ and remanded the matter with directions to grant the petition if the state did not commence new trial proceedings within a reasonable period. *Id.*

In *Devose v. Norris*, 53 F.3d 201 (8th Cir.1995), the prosecutor struck three potential black jurors on the ground that, because of prior jury experience, they "suffered from jury burnout." *Id.* at 203. Again, the Court of Appeals noted that numerous white jurors had not been stricken, despite previous jury service. Based upon this, the court affirmed the district court's decision that the defendant had stated a *prima facie* case of purposeful discrimination and that the prosecutor had "failed to articulate race-neutral reasons for striking the black prospective jurors." *Id.* at 205.

In *Johnson v. Vasquez*, 3 F.3d 1327 (9th Cir.1993) *cert. denied sub nom., Calderon v. Johnson*, 511 U.S. 1085, 114 S.Ct. 1838, 128 L.Ed.2d 465 (1994), the prosecutor struck the only African–American member of the jury after noticing that defense counsel appeared to be "excluding people from particular races." *Id.* at 1328. He offered four race-neutral justifications for striking the African–American juror: (1) that she had worked for a defense attorney; (2) that she was uneducated; (3) that she had been evasive in answering questions; and (4) that her age was a problem. *Id.* Reviewing the transcript, the court found no support for any portion of this rationale. The court concluded as follows:

> In sum, the record before us belies each of the prosecutors' facially race-neutral explanations. In view of the multiple erroneous reasons advanced, we cannot accept the

proposition that the prosecutors alleged mistaken beliefs can support a challenge free of constitutional taint. When there is reason to believe that there is a racial motivation for the challenge, neither the trial court nor we are bound to accept at face value a list of neutral reasons that are either unsupported on the record or refuted by it. Any other approach leaves *Batson* a dead letter.

*Id.* at 1331.

In *Ford v. Norris*, 67 F.3d 162 (8th Cir. 1995), the prosecutor justified his decision to strike one black juror on the ground that the juror was "illiterate" and his decision to strike a second African–American juror on the ground that he "felt she was not strong on the issue of the death penalty." *Id.* at 168. The court stated:

> Ordinarily, given the trial court's proximity, we afford great deference to its determination that a peremptory strike was made for race-neutral reasons, which is a purely factual issue. Moreover, in a 28 U.S.C. § 2254 habeas case, state court findings of fact are entitled to a presumption of correctness. In this case, however, the record simply offers no support whatsoever for the prosecutor's stated reasons for striking jurors Billips and Talley, and thus, in the context of all of the evidence, we conclude that the district court's findings that the prosecutor's stated reasons were pretext for excluding the jurors on the basis of race are not clearly erroneous.

*Id.* at 169.

Applying the *Batson* analysis to the facts of this case, the court need not linger long over the first stage, the *prima facie* showing that the prosecutor struck jurors because of race. Here, the prosecutor struck all four potential black jurors, in a rape case involving a black defendant and white victims. Moreover, the trial court requested, and the prosecutor supplied, justification for the strikes. Under these circumstances the question of whether a prima facie showing was made is "moot." *Perez*, 35 F.3d at 635.

Nor does the second-stage inquiry require much discussion. The explanations offered by the prosecutor—the "equivocation" in response to questions, the residence near and possible contact with the defendant or witnesses, the limited education and the vacation plans—are all race neutral. Although (as *Purkett* teaches) plausibility is not required at this stage of the analysis, all these justifications, if they were supported on the record, would in fact be perfectly reasonable explanations for the prosecutor's decisions.

The third stage, however, is the rock that Respondent's argument splits upon. As to *at least* two of the four black potential jurors there is, quite simply, no fair support in the record for the prosecutor's purported legitimate justification for the strikes.

Before addressing these two jurors, it is worth noting that the support for the strikes of the other two African American jurors was, to put it generously, markedly weak. One juror indicated her willingness to serve despite vacation plans, but was nevertheless excused. The other was challenged due to her residence at some unspecified point in time in the North End of Springfield, without any inquiry into specifics of time or place. Standing alone, and in an ideal world, these challenges might seem odd but passable. In the overall context of what ultimately happened in this case, it is difficult not to view them as suspect.

The rationales offered to challenge the two other jurors pass beyond the suspect to the flatly unsupportable. The transcript of the questioning of juror 4–1 reveals no significant "equivocation" in answering the court's questions about the credibility of police officers, certainly nothing as substantial as the uncertainty exhibited by the white juror in response to the same questions. The answers of juror 4–5 regarding her seven children reveal no limited intellectual capacity. Moreover, the central issue in this case was relatively straightforward: alibi and identification. The Appeals Court decision makes the point clearly.

> The primary issue at the trial was the identification of the assailant. An alibi defense was offered: the defendant claimed that he was sleeping in his aunt's apartment when the rapes occurred. There was nothing in that defense that was, or could have been, demonstrably

self-refuting because of concepts of distance.

*Caldwell I,* 36 Mass.App.Ct. at 577, 634 N.E.2d 124 (citations and internal quotation marks omitted). The SJC itself noted that "the issues that were central to this case may not be viewed as complex." *Caldwell II,* 418 Mass. at 781, 641 N.E.2d 1054.

The problem with the Commonwealth's position is not the absence of facial validity from the proffered explanation. Like the long hair and beard the prosecutor objected to in *Purkett,* the basis for the prosecutor's decision, viewed in the abstract, was race neutral. Caldwell's Petition presents a scenario in which—if the court possessed a videotaped and not only a typewritten record of the proceedings—a review of the record revealed that the challenged juror was, in fact, clean shaven and with neatly trimmed hair. In other words, the facts here just do not match the explanation.

Nor should the court's analysis stop dead at the mention of the subjective word "demeanor." This is like setting a mouse in the path of an elephant. As the record clearly indicates, the prosecutor's justification did not primarily rely on references to demeanor, though the elusive quality of the term may have been too tempting not to throw in as a makeweight. Fortunately, in this case, the nature of the Commonwealth's expressed concerns with these jurors can be found, or not found, in the written record. It is notable, in fact, that no effort was made the put the issue of the juror's "demeanor" into the record by references of tone of voice, hesitancy or delay in answering questions, body language, facial expressions or the like—all of which would be expected had the prosecutor's problems with the jurors really stemmed from observations of this sort.

The reality that some element of subjectivity is at work in the selection of a jury cannot be placed in the roadway to frighten off subsequent review. To take this approach, in a case when no remotely plausible connection can be discerned between the record of the case and the explanation offered would be to render *Batson,* in the words of the Ninth Circuit, a "dead letter."

Finally, the facts underlying this Petition present a vastly more compelling call for remedy than those presented by the cases that have so far reached the Court of Appeals in this circuit. In *Perez* the prosecutor stated that he challenged a black juror because of her employment at a city housing authority and his suspicion that she might have been exposed to drugs during her employment. There was no dispute that the employee, in fact, was so employed, or that such contact was possible. *Perez,* 35 F.3d at 635. The First Circuit concluded that the trial court's decision to accept this race-neutral explanation did not constitute clear error.

The *Bergodere* case involved "a single strike, not multiple strikes" of one juror who admitted that it would be "a struggle" to be impartial and who conceded he had a "problem" with cases involving "adults and drugs." *Bergodere,* 40 F.3d at 516–17. Again, the record clearly supported the prosecutor's rationale.

Finally, in *Brewer,* 119 F.3d 993, the Court of Appeals was presented with a mare's nest of facts and law, in which trial counsel had failed to make adequate contemporaneous objections or even insure a sufficient record to demonstrate a juror's minority race.

In the end, the most obvious explanation for what happened at the trial of this case is that the prosecutor knocked all the potential black jurors off because he thought, weighing his chances, that he probably had a somewhat higher likelihood of getting a conviction from a jury with few, or no, African American jurors. When challenged, he constructed the best race-neutral rationale he could come up with on the spot, perhaps even convincing himself that these were his real reasons. This tactic might have been permissible under *Swain,* but it is not permissible under *Batson.*

The prosecutor's strategy here was, in fact, precisely the vice *Batson* was intended to remedy. Justice Marshall's powerful concurrence details the overwhelming statistics clearly evidencing the tendency to remove potential black jurors in cases involving black defendants. The instruction book of the Dallas County, Texas prosecutor's office, for ex-

ample, explicitly advised prosecutors to challenge "any member of a minority group." *Batson*, 476 U.S. at 104. Justice White, in his own separate concurrence in *Batson*, notes his conviction that "the practice of peremptorily eliminating blacks from petit juries in cases with black defendants remains widespread." *Id.* at 101. Given this, he concludes that the remedy described in *Batson* is proper despite "the significant effect it will have on the conduct of criminal trials." *Id.* at 102.

It is perhaps only human nature to take hold of whatever tool strikes one, rightly or wrongly, as appropriate to increase the chances of victory in the highly adversarial environment of a trial. But certain tactics are off limits. Under *Batson*, what the prosecutor did here violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. The Petition will therefore be granted.

## IV. CONCLUSION

It would not be difficult to write an opinion denying this Petition. A reference to the special consideration due a trial judge, with appropriate citations to the law, and a recognition of the race-neutral quality of the proffered explanations, with appropriate citations to the record, and the task would be quickly done. Nor does the Petitioner, a convicted rapist who may soon be eligible for parole in any event, present the most winning object of the court's concern. The Commonwealth's side exhibited, and surely felt, no conscious desire to discriminate, only the will to obtain a conviction for a heinous crime the prosecutor, no doubt, sincerely felt had been committed by this defendant.

A time-consuming review of the record, however, simply supports no plausible conclusion but that the African–American jurors, called to the courthouse to perform their duty as any other citizens, were challenged because of their race. Our Constitution does not permit this. For this reason the petition for writ of habeas corpus will be allowed, and the Petitioner Michael Caldwell will be ordered released unless, by August 1, 1998, he is given a new trial by the Commonwealth of Massachusetts. All non-*Batson* claims will be dismissed.