USCA1 Opinion

 

 

 United States Court of Appeals
 For the First Circuit
 ____________________

No. 98-1511

 MICHAEL CALDWELL,

 Petitioner, Appellee,

 v.

 MICHAEL T. MALONEY,

 Respondent, Appellant.

 
 ____________________

 
 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Michael A. Ponsor, U.S. District Judge]

 ____________________
 
 Before

 Boudin, Lynch, and Lipez, Circuit Judges.
 ____________________

 Gregory I. Massing, Assistant Attorney General, with whom
Scott Harshbarger, Attorney General, was on brief, for appellant.
 Alan Jay Black for appellee.
 

 ____________________
 
 
 November 2, 1998
 ____________________ LYNCH, Circuit Judge. Michael Caldwell, an African-
American man, was tried in Massachusetts state court in 1986 for
the rape, sexual assault, and kidnapping of two women, who were
white. During jury selection, defense counsel timely objected to
four of the prosecutor's peremptory challenges, asserting that the
prosecutor had purposefully struck all the black jurors on the
basis of their race. The trial judge overruled the objection, and
Caldwell was ultimately convicted on all charges by a jury that had
no black members. These convictions were reversed by the
Massachusetts Appeals Court on the ground that several of the
challenges were impermissibly race-based; but that ground was
rejected and the conviction was reinstated by the unanimous
Massachusetts Supreme Judicial Court.
 On subsequent habeas review, the federal district court,
finding that two of the peremptory challenges at issue were
discriminatory under Batson v. Kentucky, 476 U.S. 79 (1986), thus
disagreeing with both the state court which had tried the case and
the Massachusetts Supreme Judicial Court, issued a writ of habeas
corpus requiring Caldwell to be retried or released. Under
governing Supreme Court precedent, we now reverse the order issuing
the writ of habeas corpus.
 I
 At about 3 a.m. on August 18, 1985, two young white women
left a hotel in downtown Springfield after a pre-wedding party. As
they approached their car, an African-American man came up behind
them, held up a knife, and ordered them into the front seat. He
then drove them to a park, where he raped one of the women
repeatedly and forced both of them to perform various sexual acts. 
The attack lasted about an hour and a half. When the man was ready
to leave, the car would not start, so he walked with the two women
for about a mile, then left them.
 Both of the women selected Michael Caldwell's photograph
from a photo array, and details and descriptions given by the women
(such as the attacker's preferred brand of cigarette) corresponded
to Caldwell's habits and appearance. When Caldwell was arrested
and informed that he was suspected of kidnapping and rape, he
responded, "two white girls?" In his statement to the police,
Caldwell said that on the night in question he was with his
girlfriend until about 3 a.m., arrived at Antonio's Grinders at 4
a.m. and found it closed, and then went to his grandparents' house
and went to sleep. Caldwell later changed his statement and said
that he was with his girlfriend until about 2:45 a.m., went to
Pizza King a few minutes later and ordered a sandwich, and reached
his grandparents' house at 3:00 or 3:30 a.m.
 Caldwell was charged with rape, kidnapping, and related
counts, and jury selection for his trial took place in Hampden
County Superior Court on March 27, 28, and 31, 1986. At the
selection, the judge first asked the prospective jurors general
questions as a group, then brought the jurors in one by one and, in
the presence of counsel, asked ten additional questions,
elaborating as necessary. Each juror also filled out a
questionnaire.
 The state trial judge sought to empanel sixteen jurors. 
After finding eligible and seating enough prospective jurors to
fill the jury, the judge permitted peremptory challenges. The
judge then refilled the jury box with eligible jurors after each
challenge or group of challenges was exercised. The Commonwealth
challenged a group of six jurors, then an additional juror;
Caldwell challenged a group of eight, then two jurors, then one
more. The Commonwealth then exercised five more peremptory
challenges. At this point, Caldwell's counsel objected, stating
that the prosecutor had "challenged three or four blacks that were
seated on the panel."
 At the time of these challenges, the Supreme Court had
not yet decided its seminal case prohibiting racially motivated
peremptory challenges, Batson v. Kentucky, 476 U.S. 79 (1986). But
the court proceeded to hold a hearing under the authority of
Commonwealth v. Soares, 387 N.E.2d 499 (Mass. 1979), which, under
article 12 of the Massachusetts Declaration of Rights, provided at
least as much protection for defendant as does Batson. See id. at
515-16. At that hearing, the state trial judge reviewed the
answers of each of the prospective jurors to voir dire and reviewed
the prosecutor's reasons for the challenge. This review occurred
immediately after the challenges were made, when the jurors were
still present and their responses were fresh in the mind of the
trial court. The review also occurred before the court accepted
the challenges to these four jurors. The issue was whether the
prosecutor purposefully discriminated on the basis of race in
challenging prospective jurors 4-1, 4-2, 4-5, and 5-1, all four of
whom were part of the prosecutor's last group of five challenges. 
We describe the proceedings in the state trial court in detail.
 A. Juror 4-1
 Juror 4-1's answers to the questions about police officer
credibility were as follows:
 THE COURT: [M]uch of the testimony in this case will
come from police officers. If a police officer and another witness
gave you different testimony about the same incident, would you
tend to believe the police officer simply because he is a police
officer?
 THE JUROR: No, I wouldn't.
 THE COURT: How about the other way around?
 THE JUROR: If he wasn't?
 THE COURT: Yes.
 THE JUROR: No, I think I would have to consider all the
circumstances.
 THE COURT: Would you tend to put less weight on a police
officer's testimony than you would on somebody else's testimony
simply because the person is a police officer?
 THE JUROR: Less weight on him?
 THE COURT: Yes.
 THE JUROR: I would try to keep an equal weight.
 THE COURT: [G]enerally speaking do you think that police
officers tend to be more truthful than persons in other
professions?
 THE JUROR: What other professions?
 THE COURT: Anything in the whole world, like bank
examiners. That's what you do for a living?
 THE JUROR: Yes.
 THE COURT: More truthful?
 THE JUROR: I don't know. I really haven't had that much
experience.
 THE COURT: Do you think they're any less truthful?
 THE JUROR: Any less truthful? They should be more
truthful but I'm not saying that they are.
 THE COURT: How do you feel about it?
 THE JUROR: Well, I believe I would have to hear what
they have to say before and disregard what they are and then make
up my mind.
 THE COURT: Would you be able to disregard what they are?
 THE JUROR: If I had to make a decision, I would like to
and just hear what the content of what they have to say more so
than what they are.
 THE COURT: Okay.

After this exchange, the judge proceeded to the questions designed
to discern racial bias:
 THE COURT: [D]o you think that black people generally
speaking are less truthful than white people?
 THE JUROR: No.
 THE COURT: Do you think they're more truthful?
 THE JUROR: I think they're about the same.
 THE COURT: Do you really mean that?
 THE JUROR: People are people, regardless of color.

 The prosecutor's stated reason for the challenge of this

juror was his "perception of her reactions"; the prosecutor said
that most of her answers had been clear but that he thought she was
"equivocating" and "hesitat[ing]" in her answers to the police-
officer-related questions. He also indicated that her statement
that police officers "should be more truthful" gave him concern. 
The court ruled that "from my point of view at this time, based on
what I have seen and what I have heard," the challenge was
acceptable.
 B. Juror 4-2
 At the conclusion of juror 4-2's individual voir dire,
the prosecutor told the court that police officer Michael Sands,
who was sitting at counsel table with the prosecutor and who had
been named as a witness, thought that he might have had dealings
with members of the juror's family in the North End of Springfield
(the juror's last name and the fact that she had eight children
were apparently listed on her questionnaire). The court asked the
juror if she had ever lived in the North End of Springfield, and
she said that she had. However, before the questioning proceeded
any further, the prosecutor said, "I withdraw any further questions
with respect to this juror at this time, your Honor," and the juror
was seated.
 The prosecutor offered two reasons in support of his
later peremptory challenge of this juror: Officer Sands's contact
with the juror's family, and the juror's former residence in the
North End, where she allegedly lived "within a few streets" of
Caldwell's home and might therefore have known or have heard of
Caldwell or members of his family. The judge accepted this
explanation.
 C. Juror 4-5
 The individual voir dire of juror 4-5 began with the
judge asking the juror if she understood all of the written
questions, to which she replied, "[t]he best I could." He also
asked her if he was reading the questions too quickly. After the
juror answered all of the judge's questions, this colloquy ensued:
 THE COURT: Is there anything further that you want me to
inquire of this particular prospective juror, [prosecutor]?
 [PROSECUTOR]: Yes, Judge, simply just the ages of her
children. I may not have understood that before.
 THE JUROR: Eighteen through thirty-seven.
 THE COURT: Can you tell us the age, how many kids have
you got?
 THE JUROR: I've got seven. The youngest is eighteen and
the oldest one is thirty-seven or will be thirty-seven years old.
 THE COURT: Can you remember all of them, how old they
are? Can you remember them one by one?
 THE JUROR: Okay. Starting with the oldest one, she's
thirty-six and she would be thirty-seven this year. The next one,
she was born in '51, so that means she's -- I can't give it offhand
like that. Then I've got a son that's thirty. He was born in '55.
 THE COURT: You can remember the years they were born,
right?
 THE JUROR: I can remember that better than I can the
age.
 THE COURT: Give us the years then.
 THE JUROR: The oldest one was born in 1948, the next one
was born in 1951 and the next one was born in 1955. The next one
was born in 1957 and the next one was born in 1961. The baby was
born in 1967. It's easier for me like that.
 The prosecutor's explanation for his challenge of this
juror centered around her fifth grade education level (a fact that
was revealed on her questionnaire) and her inability to calculate
her children's ages by subtracting the year of each's birth from
the current year. He stated that he doubted that she would be able
to understand some of the concepts in the case, emphasized the
importance of issues of time, distance, and identification, and
declared that he considered the case "complex." He also briefly
mentioned the juror's "demeanor, the way she handled those
questions and the way she responded to the further questions of
your Honor" and argued that she had not dealt with the questions as
well as the other prospective jurors. The judge permitted the
prosecutor's challenge.
 D. Juror 5-1
 When the judge asked the whole panel of prospective
jurors whether anyone had a problem with serving for a week, juror
5-1 said that she had a vacation planned that could not be
rescheduled. During the individual questioning, her vacation plans
came up again:
 THE COURT: What trouble were we having earlier, the fact
that the case might run for the rest of the week?
 THE JUROR: That's it, yes.
 THE COURT: How do you feel about it now? Do you think
you could stay with us for the rest of the week?
 THE JUROR: No.
 THE COURT: Tell us again why.
 THE JUROR: My husband has a few days off that he wanted
to go south to see about a house he was intending to buy and he has
this week and a few days next week, so that's the reason, because
he has a new job to start and he wanted to be back.
 THE COURT: You would be uncomfortable sitting then if I
insisted that you stay?
 THE JUROR: No, I wouldn't be uncomfortable. I will stay
if I have to.
 THE COURT: Gosh, I would like to have you stay.
 THE JUROR: All right. I will stay.

The prosecutor argued several times that this juror should be
excused for cause, but the court refused to excuse her and told the
prosecutor that he could exercise a peremptory challenge.
 The prosecutor followed the judge's advice. When defense
counsel objected to the challenge, the judge stated that he could
"see that one as being valid" because "it would seem to me she's
sitting rather reluctantly." Also, defense counsel at one point
conceded that "the only one that there is a plausible explanation
for is the one who said that she had to go to Georgia," although he
quickly backed down from this statement and pointed out that she
had said that "if you wanted her to serve that she would serve."
 After the judge rejected defense counsel's objections to
the prosecutor's challenges of jurors 4-1, 4-2, 4-5, and 5-1, the
Commonwealth exercised another challenge; Caldwell challenged three
jurors, then one additional juror; and the Commonwealth challenged
two jurors. Finally, both parties declared themselves satisfied
with the panel. Just before the jury was sworn, Caldwell restated
his objection to "the fact that all the black jurors that were
called were excused."
 At trial, Caldwell was questioned about what time he left
his girlfriend's house and where he went afterwards. Officer Sands
testified about the distances between various important sites: a
little over a mile from Caldwell's girlfriend's home to the spot
where the women were abducted, a mile from the area where the
attacker left the women to Caldwell's grandparents' home, and so
on. Both victims identified Caldwell as their attacker.
 On April 11, 1986, the jury convicted Caldwell on all
counts. He was sentenced to 15-20 years imprisonment.
II On appeal, the Massachusetts Appeals Court reversed
Caldwell's convictions and ordered a new trial, holding that the
prosecutor improperly challenged jurors 4-1 and 4-5 on the basis of
their race. See Commonwealth v. Caldwell, 634 N.E.2d 124 (Mass.
App. Ct. 1994). The court rejected the challenge to juror 4-1
because the juror's answers left the court "with the clear
impression -- not of equivocation, as the prosecutor argued -- but
of a conscientious person who intelligently and thoughtfully
focuses on the question asked and replies in a precise manner." 
Id. at 128. As to juror 4-5, the court found that her inability to
calculate her children's ages and her low level of education were
unimportant because the primary issue at trial was identification. 
See id. at 129. A majority of the panel also doubted the validity
of the challenge to juror 4-2 on the ground that the prosecutor
explained his reasons "vague[ly]" and did not do enough to
establish the facts about the officer's dealings with the juror's
family, but the court declined to decide this issue, stating that
"[w]hether the prosecutor succeeded in carrying his burden
regarding prospective juror 4-2 . . . is not critical to the
disposition of this case." See id. Although Caldwell had also
attacked the challenge of juror 5-1, the Appeals Court rejected
that challenge. See id. at 129 n.6.
 The Massachusetts Supreme Judicial Court ("SJC") reversed
the Appeals Court and reinstated the convictions. See Commonwealthv. Caldwell, 641 N.E.2d 1054 (Mass. 1994). The court concluded
that the trial judge was in the best position to evaluate the tenor
of juror 4-1's answers; that the prosecutor's strike of juror 4-2
was analogous to a case in which the court had upheld a strike of
a juror who lived in a neighborhood where a prosecutor had
previously investigated a multiple homicide; that the trial judge
was uniquely able to assess juror 4-5's demeanor and her "ability
to understand fully the issues to be presented at trial"; and that
juror 5-1's reluctance to serve was a "plausible" reason for
challenging her. Id. at 1056-57.
 Caldwell filed a petition for a writ of habeas corpus in
the U.S. District Court for Massachusetts on July 21, 1995. On
October 21, 1996, the magistrate judge to whom the petition had
been referred issued a Report and Recommendation recommending that
the petition be granted. The magistrate judge considered the
challenges to jurors 4-1 and 5-1 valid -- noting with respect to
the former that "there is, at the very least, some support in the
record for the prosecutor's explanation that juror 4-1 was struck
for a race-neutral reason[,] her demeanor" -- but found no record
support for the challenges to jurors 4-2 and 4-5, essentially for
the reasons articulated by the Massachusetts Appeals Court. Thus,
the Magistrate disagreed with the state Appeals Court as to juror
4-1, finding the use of the peremptory there unobjectionable. The
Magistrate disagreed with the SJC, which found all the peremptories
valid.
 The district court adopted the Report and Recommendation
in part and granted the writ, ordering that Caldwell be released
unless the Commonwealth gave him a new trial. The court
acknowledged the possibility that "crucial nuances in the selection
process may not appear on a cold record later," but emphasized that
"racial discrimination is itself subtle and can mold a prosecutor's
decisions unconsciously" and therefore must be ferreted out. 
Caldwell v. Dubois, 999 F. Supp. 199, 201 (D. Mass. 1998). The
decision rested on the prosecutor's challenges of jurors 4-1 and 4-
5, although the court added that "the support for the strikes of
the other two African American jurors was, to put it generously,
markedly weak." Id. at 211. Thus, the federal district court
disagreed with the Magistrate as to juror 4-1, finding that strike
improper. The federal trial court also disagreed with the SJC as
to jurors 4-1 and 4-5.
 The federal district court's finding as to juror 4-1 was
based on the premise that "[t]he transcript of the questioning of
juror 4-1 reveals no significant 'equivocation'" and on a
comparison to the voir dire of non-black juror 5-13, whom the
court considered to have displayed "uncertainty" that was more
"substantial" than juror 4-1's. Id. at 211. The court's
conclusion as to juror 4-5 was that her answers "regarding her
seven children reveal no limited intellectual capacity" and that,
at any rate, the central issues in the case were "straightforward"
ones of "alibi and identification." Id. The court also found it
"notable" that "no effort was made [to] put the issue of [juror 4-
5's] 'demeanor' into the record by references [to] tone of voice,
hesitancy or delay, . . . or the like." Id. at 212.
 In the end, despite acknowledging that "[i]t would not be
difficult to write an opinion denying this Petition," the district
court concluded that in the context of the case as a whole "the
most obvious explanation for what happened . . . is that the
prosecutor knocked all the potential black jurors off because he
thought . . . that he probably had a somewhat higher likelihood of
getting a conviction." Id. at 212-13.
 III Because Caldwell's habeas petition was filed before April
24, 1996, we apply the standard of review in place before enactment
of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). 
See Lindh v. Murphy, 117 S. Ct. 2059, 2068 (1997). As explained in
Brewer v. Marshall, 119 F.3d 993 (1st Cir. 1997), in a pre-AEDPA
habeas case this court reviews the state court's ruling on a Batsonchallenge with a great deal of deference:
 Under [the pre-AEDPA] standard of review, we review de novo
 the state court decision. Within that standard, deference is
 given to fact-based determinations of the trial court. 
 Decisions of trial courts regarding Batson objections are
 treated with considerable deference. On direct review, the
 Supreme Court has described the ultimate Batson question --
 intent to discriminate -- as a pure issue of fact subject to
 clear error review. . . . [T]here is no convincing reason why
 a more lenient standard should govern pre-AEDPA federal habeas
 review of state court judgments concerning fact-sensitive
 Batson determinations.
 Id. at 1004 (citations and internal quotation marks omitted).
 This deferential standard is double-layered. First, a
trial judge's Batson findings are given substantial weight because
the trial judge is in the best position to evaluate context,
nuance, and the demeanor of the prospective jurors and the
attorneys. See Batson, 476 U.S. at 98 n.21. As we pointed out in
Brewer:
 The trial judge has heard the juror's answers to voir dire
 questions or bench conferences with the juror . . . . The
 trial judge is thus likely to have a much better sense than
 any appellate panel of whether a particular challenge can
 readily be explained by some reason other than race or gender
 -- for example, other characteristics of the juror, the
 juror's demeanor, or something in the juror's background
 suggesting sympathy for one side or the other. This court has
 recognized that considerable deference is owed to a trial
 judge who observes the voir dire first hand:
 Evaluative judgments concerning juror suitability are
 often made partially in response to nuance, demeanor, body
 language, and a host of kindred considerations. Thus, the
 trial judge, who sees and hears both the prospective juror and
 the opposing attorneys in action, is in the best position to
 pass judgment on counsel's motives.
 
 Brewer, 119 F.3d at 1004 (quoting United States v. Bergodere, 40
F.3d 512, 517 (1st Cir. 1994)) (internal quotation marks omitted);
see also United States v. Perez, 35 F.3d 632, 635-36 (1st Cir.
1994).
 Second, in a pre-AEDPA habeas case, a state court's
ruling on whether a prosecutor's use of a peremptory challenge was
motivated by discriminatory intent in violation of Batson is a
factual determination that "shall be presumed to be correct unless"
the determination "is not fairly supported by the record." 28
U.S.C. 2254(d) (pre-AEDPA version) (enumerating several other
exceptions to the correctness presumption, exemptions not at issue
in the instant case); see Purkett v. Elem, 514 U.S. 765, 769
(1995) (per curiam); Hernandez v. New York, 500 U.S. 352, 364-66
(1991) (plurality opinion). Caldwell argues only that the
presumption of correctness is not applicable to his case because
the trial court's rulings are "not fairly supported by the record."
He does not address the other seven exceptions or assert that he
has rebutted the presumption of correctness "by convincing
evidence." 28 U.S.C. 2254(d) (pre-AEDPA version). Accordingly,
in reviewing such a determination, a federal habeas court has "no
license to redetermine credibility of witnesses whose demeanor has
been observed by the state trial court, but not by them," and must
"more than simply disagree with the state court" in order to reach
a different result. Marshall v. Lonberger, 459 U.S. 422, 432-34
(1983); see also Leavitt v. Howard, 462 F.2d 992, 996 (1st Cir.
1972) (analogizing the "fair support" standard to the "clearly
erroneous" standard).
 There is no doubt that the pre-AEDPA standard
significantly limits Batson review on habeas because the trial
court's findings of historical fact necessarily resolve the
ultimate issue of the prosecutor's intent. This limitation
expresses a judgment that "as a matter of the sound administration
of justice, one judicial actor is better positioned than another to
decide the issue in question." Miller v. Fenton, 474 U.S. 104, 114
(1985). It also provides society and the defendant with "the
certainty that comes with an end to litigation," Sumner v. Mata,
449 U.S. 539, 550-51 & n.3 (1981), and reduces friction between the
state and federal systems, see id.
 However, the presumption does not, as Caldwell suggests, 
so limit federal review that it is a nullity. There are scenarios
in which the record is unlikely to fairly support a state trial
court's rejection of a Batson challenge. First, there may be no
explanation at all or nothing stated which would even pass as a
reasoned explanation. "Clearly the most vulnerable reasons are
those based on hunches and intuitions." Gertner & Mizner, The Law
of Juries 4-47 (1997). Some explanations are completely
implausible. Others may be facially plausible, but raise a serious
question of pretext where a prosecutor's explanation for a strike
is equally applicable to a juror of a different race or gender who
has not been stricken. See, e.g., DeVose v. Norris, 53 F.3d 201,
203-05 (8th Cir. 1995) (finding the state's reason for excusing
black jurors -- that they were suffering from "jury burnout" --
pretextual given that several white prospective jurors who were not
struck also stated that they had previously served on juries). 
Serious questions are also raised in cases in which the facts in
the record are simply objectively contrary to the prosecutor's
statements, see, e.g., Johnson v. Vasquez, 3 F.3d 1327, 1330-31
(9th Cir. 1993) (finding that several of the prosecutor's reasons,
including the juror's alleged experience working for a defense
attorney, were contradicted by the record), or the prosecutor's
statements themselves admit race plays a role, see, e.g., id. at
1329-30 (noting contemporaneous remarks by the prosecutor
indicating that race played a role in his decision to strike the
juror), or there is direct evidence of bias on the part of the
prosecutor or the judge, see Cochran v. Herring, 43 F.3d 1404,
1410, 1412 (11th Cir. 1995) (involving testimony from prosecutors
that the District Attorney's office had an informal policy of
striking jurors based on race), modified on other grounds, 61 F.3d
20 (11th Cir. 1995).
 A reviewing court's level of suspicion may also be raised
by a series of very weak explanations for a prosecutor's peremptory
challenges. The whole may be greater than the sum of its parts. 
When a number of jurors are struck, "[a]n explanation for a
particular challenge need not necessarily be pigeon-holed as wholly
acceptable or wholly unacceptable. The relative plausibility or
implausibility of each explanation for a particular challenge . .
. may strengthen or weaken the assessment of the prosecution's
explanation as to other challenges and thereby assist the fact-
finder in determining overall intent." United States v. Alvarado,
923 F.2d 253, 256 (2d Cir. 1991); see also United States v.
Alvarado, 951 F.2d 22, 26 (2d Cir. 1991) (appeal after remand)
("The [judicial] officer may think a dubious explanation undermines
the bona fides of other explanations or may think that the sound
explanations dispel the doubt raised by a questionable one.").
 It is also important to keep in mind that the broad
authority vested in the trial judge to make Batson rulings on the
basis of first-hand observations of attorneys and prospective
jurors may often work in a defendant's favor. For instance, a
judge's evaluation of the demeanor and credibility of an attorney
or a juror may lead the judge to uphold a defendant's peremptory
challenge in the face of a Batson objection by the prosecutor, seeGeorgia v. McCollum, 505 U.S. 42, 59 (1992), or to accept a
defendant's Batson objection to a prosecutor's peremptory
challenge. See generally Batson, 476 U.S. at 99 n.22 (disagreeing
with the doubts expressed in Justice Marshall's concurring opinion
about trial judges' enforcement of Batson's mandate).
 IV With an eye toward the deference owed to the state trial
judge, we view the analysis through Batson's three-step procedure. 
Under Batson, "once the opponent of a peremptory challenge has made
out a prima facie case of racial discrimination (step 1), the
burden of production shifts to the proponent of the strike to come
forward with a race-neutral explanation (step 2). If a race-
neutral explanation is tendered, the trial court must then decide
(step 3) whether the opponent of the strike has proved purposeful
racial discrimination." Purkett, 514 U.S. at 767. "The second
step of this process does not demand an explanation that is
persuasive, or even plausible," but at the third step "the
persuasiveness of the justification becomes relevant," and
"implausible or fantastic justifications may (and probably will) be
found to be pretexts for purposeful discrimination." Id. at 767-
68.
 In this case, only step 3 of the test is at issue. SeeHernandez, 500 U.S. at 359 ("Once a prosecutor has offered a race-
neutral explanation for the peremptory challenges and the trial
court has ruled on the ultimate question of intentional
discrimination, the preliminary issue of whether the defendant had
made a prima facie showing becomes moot."); Purkett, 514 U.S. at
768; Perez, 35 F.3d at 635. At this step, the crucial issue is
whether the challenge was motivated by racial discrimination. SeeHernandez, 500 U.S. at 359-60 (noting the "fundamental principle"
that "[p]roof of racially discriminatory intent or purpose is
required to show a violation of the Equal Protection Clause"
(internal quotation marks omitted)); Batson, 476 U.S. at 93
(stating that the burden is on the "defendant who alleges
discriminatory selection of the venire to prove the existence of
purposeful discrimination" (emphasis added) (internal quotation
marks omitted)). On this issue, "[t]here will seldom be much
evidence . . . , and the best evidence often will be the demeanor
of the attorney who exercises the challenge." Hernandez, 500 U.S.
at 365.
 The federal district court's finding of a Batsonviolation rested on the challenges to jurors 4-1 and 4-5. Because
Caldwell "is entitled to defend the district court's judgment on
any properly preserved ground that would serve to sustain it,
whether or not adopted by the district court," Beauchamp v. Murphy,
37 F.3d 700, 706 (1st Cir. 1994), we address each of the four
jurors whom Caldwell claims to have been improperly challenged. 
The question is whether Caldwell has met his burden of showing that
there is not fair support in the record for the state trial judge's
determination that the prosecutor's strike as to each juror was not
motivated by race discrimination.
 A. Juror 4-1
 We conclude that the trial court's acceptance of the
prosecutor's explanation for the challenge of juror 4-1 finds more
than fair support in the record. The cold transcript alone
demonstrates that the juror was hesitant or uncertain (for
instance, she asked the judge for more detail on one of the
questions about police officer truthfulness and then stated that
she did not know and had not had that much experience). The
transcript reveals that the judge had reason to doubt her answers
(one of her responses to the racial bias questions prompted the
judge to ask, "[d]o you really mean that?"). Also, the substance
of one of her answers -- "[Police officers] should be more truthful
but I'm not saying that they are" -- indicates some inclination to
hold the police to a higher standard than other witnesses. Cf.United States v. Moreno, 878 F.2d 817, 820-21 (5th Cir. 1989)
(rejecting a Batson objection to a strike that was based on "a
hostile attitude toward police officers during defense voir dire").
 The trial judge, of course, did not face a cold
transcript. He was the only one of the many judges who has
addressed this case who had an opportunity contemporaneously to
observe juror 4-1's responses, and he apparently saw no reason to
question the prosecutor's assertion that the juror was hesitating
and equivocating in her answers to the questions about police
officers. The conclusion of the federal district court that juror
4-1 was not equivocating, or was just being thoughtful, gives
insufficient weight to considerations of body language, intonation,
demeanor, pacing and the like and to the trial judge's superior
ability to evaluate these considerations.
 Further, a comparison of juror 4-1's voir dire with the
voir dire of non-black juror 5-13, relied on by the district court,
does not indicate that the prosecutor's explanation for his
challenge was pretextual. Certainly, as a general matter,
comparisons between challenged jurors and similarly situated,
unchallenged jurors of a different race or gender can be probative
of whether a peremptory challenge is racially motivated. Such
comparisons are likely to be more probative when the reason for the
strike is an objective characteristic such as age or profession. 
 More specifically, although juror 5-13's voir dire is
superficially similar -- there is uncertainty about how to answer
the police-officer-related inquiry, and an exchange with the judge
that goes beyond the ten scripted questions -- the two colloquies
are different in a crucial respect. Juror 4-1's answers may be
read as holding police officers to higher standards than others or
even as suggesting hostility toward police officers. In contrast,
the most plausible reading of juror 5-13's answers is that the
juror believed that police officers are more truthful in the
conduct of their jobs than are people in other professions, but
that in daily life -- acting as a spouse or a neighbor rather than
as an officer -- officers are just as likely to lie as anyone else. 
The prosecutor and others who were present may well have considered
juror 5-13, equivocations and all, to be a pro-government juror. 
See Patton v. Yount, 467 U.S. 1025, 1038 n.14 (1984) (noting that
demeanor is important in "simply understanding what a potential
juror is saying" and that "[d]emeanor, inflection, the flow of the
questions and answers can make confused and conflicting utterances
comprehensible"). This conclusion is bolstered by the fact that
defense counsel peremptorily challenged juror 5-13, suggesting that
the defense saw her as a pro-government juror.
 B. Juror 4-2
 We also find fair support in the record for the trial
court's conclusion that the prosecutor's explanation for his
challenge of juror 4-2 was not a pretext for race discrimination. 
 The prosecutor advanced two reasons that were plausible
and specifically linked to Caldwell's case. The first is the
juror's possible relationship, through arrests of or incidents
involving her children, with Officer Sands. Cf. United States v.
Terrazas-Carrasco, 861 F.2d 93, 94-95 & n.1 (5th Cir. 1988)
(listing the fact that the prospective juror had "the same last
name as someone previously convicted by the prosecutor" as one of
a number of grounds for valid peremptory challenges); United Statesv. Tindle, 860 F.2d 125, 128-29 (4th Cir. 1988) (accepting as race-
neutral the prosecutor's explanation that the surname of
prospective juror Granderson closely resembled the surname of one
Grandison, a defendant in one of the prosecutor's cases). The
second is her possible contacts with the Caldwell family due to her
previous residence near the Caldwells in the North End. See United
States v. Williams, 936 F.2d 1243, 1247 (11th Cir. 1991)
(collecting cases upholding peremptory challenges based on a
geographic relationship between a prospective juror and the case to
be tried); see also United States v. Angiulo, 847 F.2d 956, 985 &
n.37 (1st Cir. 1988) (upholding a district judge's acceptance of a
Batson-challenged strike, stating that a strike based on the
prospective juror's residence in "a small town where a number of
the defendants and their cousins resided" was permissible).
 Neighborhoods of residence and, sometimes, names may be
race-linked characteristics. See Hernandez, 500 U.S. at 363 ("If
a prosecutor articulates a basis for a peremptory challenge that
results in the disproportionate exclusion of members of a certain
race, the trial judge may consider that fact as evidence that the
prosecutor's stated reason constitutes a pretext for racial
discrimination." (citing Washington v. Davis, 426 U.S. 229, 242
(1976)); Perez, 35 F.3d at 635-36; cf. United States v. Bishop, 959
F.2d 820, 825-26 (9th Cir. 1992) (holding that the prosecutor's
statement that a prospective juror was likely to have negative
feelings about police because she lived in a poor, black
neighborhood was not race-neutral because the prosecutor used
residence as a "surrogate for racial stereotypes" rather than as a
"link connecting a specific juror to the facts of the case"). But
even when the criterion used by the prosecutor has a discriminatory
impact, unless the government actor adopted a criterion with the
intent of causing the impact asserted, that impact itself does not
violate the principle of race neutrality. See Hernandez, 500 U.S.
at 360. Here, there is little reason to think the grounds were
proxies for race discrimination. If the juror's children had a
relationship based on prior run-ins with a police officer
associated with the prosecution, that was an adequate, race-neutral
reason. Similarly, if the juror knew Caldwell's family, that was
also an adequate, race-neutral reason.
 It may be argued that the record before the trial judge
did not establish that either of these events are in fact true. 
There are two responses. The first is that the ultimate burden of
proof is on the party making the Batson challenge. This means that
inadequacies in the record which preclude a determination of
whether facts exist to support the prosecutor's reasoning works to
Caldwell's disadvantage. See Batson, 476 U.S. at 94 n.18. The
second is that the prosecutor stated that he was acting on
information provided to him by Officer Sands, and the prosecutor's
on-the-spot reliance on this information was perceived as genuine
by the trial judge -- regardless of whether the information was in
fact accurate.
 C. Juror 4-5
 The propriety of the challenge of juror 4-5 is a closer
issue, but the trial judge's acceptance of this challenge is also
entitled to the presumption of correctness and we conclude that the
presumption has not been rebutted.
 The juror's fifth grade education level and her inability
to calculate her children's ages on the spot are not in question.
What is less clear is how relevant those facts are in light of the
nature of the underlying case. Challenges based on low levels of
formal education have frequently been accepted over a Batsonobjection, see, e.g., United States v. Marin, 7 F.3d 679, 686-87
(7th Cir. 1993) (collecting cases), but the courts in these cases
have often noted the complex nature of the case in deciding that
education is a relevant and permissible reason for the strike. 
See, e.g., United States v. Moeller, 80 F.3d 1053, 1060 (5th Cir.
1996) (recognizing the "complex nature of the conspiracy[] and the
number of interconnected offenses alleged"); United States v.
Hinojosa, 958 F.2d 624, 631 (5th Cir. 1992) (holding that a strike
on the basis of lack of education may be proper "if that
venireman's education is insufficient when taking into account the
legal issues to be presented"); United States v. Tucker, 773 F.2d
136, 142 (7th Cir. 1985) ("The prosecutor wanted an educated jury
that could understand letters of credit and the other aspects of
this complicated commercial transaction, and the four blacks
happened to have very little education or commercial experience."). 
In the case at hand, the concepts of time, distance, and
identification which the prosecutor mentioned in his explanation
for the challenge do not appear to have been particularly complex
or difficult to understand. It is true that Caldwell's alibi
statements about where he was when and the prosecutor's theory
about his opportunity to commit the crime required jurors to do
some evaluation of the distances between places and the amount of
time needed to travel between. The state trial judge himself
questioned how relevant education level was when the prosecutor
first gave this reason.
 However, the prosecutor also raised his observations of
the juror's demeanor as he listened to her answers to the questions
about her children's ages. Although the prosecutor's reference to
demeanor was brief, we think to give much weight to the brevity of
the reference, as Caldwell urges, would not be sensible. Of
course, a simple recitation of a demeanor-based reason for a strike
by no means ensures affirmance of a judge's denial of a Batsonobjection. By the same token, we do not require any particular
code words from the counsel exercising the challenge in order to
trigger appellate consideration of the relevance of demeanor. 
Trial counsel knows that the trial judge is right there seeing the
same things that everyone else is seeing. Here, based on the cold
transcript, it is apparent that juror 4-5 could have been answering
the questions in a halting manner that made her seem confused and
unable to follow the case. Cf. Williams, 936 F.2d at 1246
(permitting a prosecutor's strike of a juror "due to her advancing
years and her apparent inability to follow the questions directed
toward her during voir dire," where the trial judge concluded that
the juror "did not appear particularly alert and may not have been
in the best of health"). 
 At any rate, the prosecutor's expressed concerns about
the juror's ability to grasp fundamental concepts were on this
record based on some combination of the juror's age-calculation
problems, level of education, and demeanor. Similarly, the trial
judge's ruling appears based on a weighing of the juror's answers,
the way the juror gave those answers, the prosecutor's demeanor,
and the way the case appeared to the participants before the trial
actually commenced. Other factors that the judge might have
considered are the prosecutor's claim that Caldwell had challenged
numerous jurors with more than a high school education and the
prosecutor's conduct of other portions of the jury selection. 
Clearly the trial judge is in the best position to make such a
complex, nuanced, observation-based inquiry.
 Further, the closeness of the issue, the ability to read
the record in a variety of ways, the disagreement among various
state and federal court judges who have examined this case, and the
district court's acknowledgment that it would be easy to write an
opinion coming out the other way -- all indicate that the
presumption of correctness should be enforced. See Wainwright v.
Goode, 464 U.S. 78, 85 (1983) (noting the number of state and
federal judges who had disagreed on the issue in question, stating
that, "[a]t best, the record is ambiguous," and concluding that
"[b]ecause both . . . conclusions find fair support in the record,
we believe the [Eleventh Circuit] erred in substituting its view of
the facts for that of the Florida Supreme Court"); see also Neronv. Tierney, 841 F.2d 1197, 1200 (1st Cir. 1988).
 D. Juror 5-1
 There is little question of the genuineness of the
prosecutor's explanation that he struck juror 5-1 because she
expressed a reluctance to serve. This was the same ground on which
he had made several unsuccessful attempts to challenge her for
cause. The trial judge blocked this for-cause challenge by
eventually working the juror into saying that she would serve if he
wanted her to serve. But the prosecutor "had no obligation either
to ignore [the juror's comments about her reluctance] or to accept
at face value [the juror's] prediction that, in the end, [she]
could put aside [her] problem and do it right." Bergodere, 40 F.3d
at 517 (internal quotation marks omitted); see also Batson, 476
U.S. at 97 ("[W]e emphasize that the prosecutor's explanation need
not rise to the level justifying exercise of a challenge for
cause."). It is undoubtedly for this reason that even defense
counsel, in the course of his objections during the trial,
acknowledged the prosecutor's support for the challenge. 
 V We are sensitive to the racially charged nature of this
case and to the suspicions which arise when four jurors of one race
are challenged, leaving no jurors of that race to sit. 
Nevertheless, giving the deference to the state trial court due
under the precedent and considering the juror strikes both
individually and as a whole, we conclude that the allowance of each
of the prosecutor's four contested peremptory challenges finds fair
support in the record, giving due deference to the view of the
judge who observed the proceedings. See generally Chappee v. Vose,
843 F.2d 25, 27 (1st Cir. 1988) ("In the last analysis [on habeas
review], we look not to the desirability of a particular state
court ruling or practice in utopian terms, but only to its
constitutional implications."). 
 We therefore reverse the grant of the writ of habeas
corpus and vacate the writ.